# Commonwealth of Massachusetts

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 2016 - 2180 D

CHRISTOPHER P. KAUDERS ET AL, Plaintiff(s)

v.

UBER TECHNOLOGIES, INC. ? RASIER, LLC, Defendant(s)

## SUMMONS

To the above-named Defendant: Rasier LLC

You are hereby summoned and required to serve upon W. PAUL NEEDHAM NEEDHAM ? JOHNSON plaintiff's attorney, whose address is 10 LIBERTY SQUARE, BOSTON, MA 02109, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Judith Fabricant, Esquire, at Boston, the _____ day of _____, in the year of our Lord two thousand _____ .

*Michael Joseph Donovan*

Clerk/Magistrate

A true copy Attest:

Deputy Sheriff Suffolk County

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT — (2) MOTOR VEHICLE TORT — (3) CONTRACT — (4) EQUITABLE RELIEF — (5) OTHER

FORM CIV.P. 1 (3)M  1/05

**NOTICE TO DEFENDANT** — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on _____, 201___, I served a copy of the within summons, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

_____

_____

_____

Dated:_____, 201___.                    _____

**N.B.**  **TO PROCESS SERVER: –**
**PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN
THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.**

| , 201 . |
|---|

(609)
(509227)

**Commonwealth of Massachusetts**

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION
No. _____

_____, Plff(s).

v.

_____, Deft(s).

SUMMONS
(Mass. R. Civ. P. 4)

(AFFIX FILING STAMP HERE)

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts The Superior Court |
|---|---|---|

**PLAINTIFF(S):** Christopher P. Kauders, Lee C.S. Kauders, and Hannah S. Kauders

**ADDRESS:** 337 Highland Avenue

West Newton, MA 02465 (all)

**COUNTY** Suffolk

**DEFENDANT(S):** Uber Technologies, Inc. and Rasier LLC

**ATTORNEY:** W. Paul Needham and Mark A. Johnson

**ADDRESS:** Needham & Johnson, 10 Liberty Square

Boston, MA 02109

**ADDRESS:** 1455 Market St., 4th Floor, San Francisco, CA 94103 (both)

Rasier LLC also has a Massachusetts address at 186 South St., Suite 20A, Boston, MA 02111

**BBO:** 366260 (Needham); 651271 (Johnson)

## TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B99 | Other Tortius Action | F | ☒ YES   ☐ NO |

*If "Other" please describe:  Discrimination against guide dog user and related claims

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
   1. Total hospital expenses ............................................................................................ $ _____
   2. Total doctor expenses ............................................................................................. $ _____
   3. Total chiropractic expenses .................................................................................... $ _____
   4. Total physical therapy expenses ............................................................................ $ _____
   5. Total other expenses (describe below) ................................................................... $ _____
                                                     Subtotal (A): $ _____

B. Documented lost wages and compensation to date ........................................................ $ _____
C. Documented property damages to dated ....................................................................... $ _____
D. Reasonably anticipated future medical and hospital expenses ....................................... $ _____
E. Reasonably anticipated lost wages ............................................................................... $ _____
F. Other documented items of damages (describe below) .................................................. $ _____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:
  Emotional distress caused by three incidents of discrimination in refusing service to guide dog user

*A true copy Attest*
*[signature]*
Deputy Sheriff Suffolk County

TOTAL (A-F):$ 250,000

### CONTRACT CLAIMS
(attach additional sheets as necessary)

Provide a detailed description of claims(s):

TOTAL: $

Signature of Attorney/Pro Se Plaintiff: X _____   Date: Jul 12, 2016

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

## CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _____   Date: Jul 12, 2016

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                              SUPERIOR COURT
                                         CIVIL ACTION NO. 2016-2180D

CHRISTOPHER P. KAUDERS,                  )
LEE C.S. KAUDERS, AND                    )
HANNAH S. KAUDERS                        )
                                         )
        Plaintiffs                       )
                                         )
v.                                       )
                                         )
UBER TECHNOLOGIES, INC. AND              )
RASIER, LLC                              )
                                         )
        Defendants                       )



### COMPLAINT AND JURY DEMAND

### PARTIES

1. Plaintiff Christopher P. Kauders is an individual residing at 337 Highland Ave., West Newton, Massachusetts.

2. Plaintiff Lee C.S. Kauders is an individual residing at 337 Highland Ave., West Newton, Massachusetts.

3. Plaintiff Hannah S. Kauders is an individual residing at 337 Highland Ave., West Newton, Massachusetts.

4. Defendant Uber Technologies, Inc. is a Delaware corporation with a principal place of business at 1455 Market St., 4th Floor, San Francisco, CA 94103 and is registered to do business in Massachusetts.

5. Defendant Rasier, LLC is a Delaware limited liability corporation with a principal place of business at 1455 Market St., 4th Floor, San Francisco, CA 94103, is registered to do

business in Massachusetts, and has a Massachusetts office at 186 South St., Suite 20A, Boston,

MA 02111. On information and belief, Rasier, LLC is wholly-owned subsidiary of Uber

Technologies, Inc. The Defendants will hereinafter be referred to collectively as "Uber."

## FACTS

### Introduction

6. Christopher P. Kauders ("Kauders") is legally blind and uses a Seeing Eye dog named

Wally. He has been registered as legally blind with the Massachusetts Commission for the Blind

since the 1960's, and his low vision prevents him from qualifying for a driver's license.

7. Kauders is an experienced guide dog user and has traveled with the assistance of a

guide dog for 37 years. Wally was trained at the Seeing Eye, which is an accredited guide dog

school and the oldest guide dog school in the world.

8. Uber is an online transportation network company that has developed mobile software

applications for smartphones that allow customers to submit trip requests for transportation in

Uber vehicles. Uber services the Boston area, as well as other locations in Massachusetts and

throughout the United States.

9. As detailed below, on three separate occasions, Kauders has been denied service by

Uber when Uber drivers refused to allow Wally into their vehicles. Plaintiffs Lee C.S. Kauders

and Hannah C. Kauders witnessed one of these incidents.

### Kauders's History as an Uber Customer

10. Kauders opened an account with Uber in 2014, at which time Uber required

submission of his credit card information.

11. Kauders has been licensed to practice law in Massachusetts since 1981. He is an

arbitrator and mediator at Pre-Trial Solutions, Inc., at 10 Liberty Square, 5th Floor, Boston, MA

02109. Kauders relied on Uber on weekdays to travel to scheduled arbitrations and mediations outside of Boston, in the evening when he and his wife needed to get from their home to locations in Boston, and on weekends.

12. Kauders has used Uber to travel to scheduled arbitration and mediation sessions as far from Boston as Haverhill, Massachusetts, near the New Hampshire border.  Public transportation is often not feasible and Uber's service is significantly less expensive than paying for a taxi to a distant location.

13. Uber has accepted payment from Kauders for more than 100 rides.

14. Wally has accompanied Kauders on approximately half of his rides in Uber vehicles.

15. The other rides took place either during the months when Kauders used a cane while waiting to train with Wally after the death of his previous Seeing Eye dog or during evenings when he used a cane while accompanied by his wife. Interestingly, Kauders experienced no unlawful discrimination while traveling with his cane.

16. Kauders has been told by a Uber few drivers that he has a high star rating and, therefore, is considered a desirable customer.

### Uber's Control Over its Drivers

17. Uber plays a gatekeeping role in deciding who can act as a driver in Uber vehicles. It administers exams, runs criminal background checks, reviews driving records, licenses, vehicle registrations, and insurance, and requires prospective drivers to fill out various other forms.

18. When a candidate becomes a driver, Uber controls the transmission of trip requests to the driver and tightly regulates driver conduct and appearance, vehicle condition, and the payment procedure. Uber also provides drivers with supplies and maintains commercial liability insurance in the event of driving-related claims.

3

19. Uber has the exclusive right to terminate drivers – a right it exercises routinely for any number of reasons, such as poor customer ratings.

20. Uber also controls who may even become a passenger by limiting the pool of prospective customers to those with credit cards and smartphones that can properly run its App.

21. Uber's degree of control and, more importantly, right of control over their drivers, makes them employers and therefore vicariously liable for the actions of their drivers.

22. In addition to being under Uber's control, the drivers acted on behalf of and for the benefit of Uber by performing the task by which Uber makes money, representing Uber in so doing, and making reports to Uber, including passenger ratings. Accordingly, the drivers are Uber's agents and, as principal, Uber is responsible for their acts.

## UBER'S DISCRIMINATION AGAINST KAUDERS

23. Mass. Gen. Laws c. 272, § 98A provides as follows:

Notwithstanding any other provision of law, any blind person, or deaf or hearing handicapped person, or other physically handicapped person accompanied by a dog guide, shall be entitled to any and all accommodations, advantages, facilities and privileges of all public conveyances, public amusements and places of public accommodation, within the commonwealth, to which persons not accompanied by dogs are entitled, subject only to the conditions and limitations applicable to all persons not accompanied by dogs, and no such blind person, or deaf or hearing handicapped, or other physically handicapped person shall be required to pay any charge or fare for or on account of the transportation on any public conveyance for himself and such dog so accompanying him in addition to the charge or fare lawfully chargeable for his own transportation. Whoever deprives any blind person, or deaf or hearing handicapped person, or other physically handicapped person of any right conferred by this section shall be punished by a fine of not more than three hundred dollars and shall be liable to any person aggrieved thereby for such damages as are set forth in section five of chapter one hundred and fifty-one B; provided, however, that such civic forfeiture shall be of an amount not less than one hundred dollars.

## First Incident of Discrimination–August 26, 2015

24. At or about 8:23 p.m. on August 26, 2015, Kauders used his iPhone to request an

Uber pick up at the University Club of Boston, 426 Stuart St., Boston. Uber vehicles had picked

Kauders up at that location on other occasions, and Kauders was familiar with the process of

exiting the building and entering the vehicle with the assistance of Wally.

25. A few minutes after the request, Uber notified Kauders via smartphone that the driver

had arrived and that he was driving a black Toyota, license plate 4ELD80.

26. Kauders and Wally then exited the building, at which point Kauders was greeted by

two acquaintances, Russell Goudreau and his son, Seth Goudreau, who are both attorneys, as

well as the University Club's assistant general manager, Alex Noskovic. They advised him that

the Uber vehicle was straight ahead.

27. After Wally led Kauders to the rear passenger door of the vehicle, Kauders realized

that the window was down. He called through the window and greeted the driver.  Kauders asked

the driver to unlock the back door so he could enter.  On this warm summer evening, the three

witnesses standing near Kauders on the sidewalk could easily hear the conversation, as both of

the windows on the passenger side of the vehicle were rolled down.

28. In response to Kauders's request that the rear door be opened, the driver stated "this is

my car. No dogs allowed." Kauders clearly advised the driver: that he was blind; that he was

traveling with the assistance of a guide dog; and that the driver was legally required to give him a

ride. Kauders then once again calmly requested that the driver unlock the door, whereupon the

driver calmly and clearly repeated the same statement – "this is my car. No dogs allowed." The

three men on the sidewalk heard this conversation and calmly advised the driver that he was

required by law to give Kauders a ride. The driver did not respond and shortly thereafter drove away.

29. This incident left Kauders humiliated in the presence of two other attorneys, both of whom regularly use Uber without difficulty.

30. During subsequent conversations between Kauders and four different Uber employees, the employees all: acknowledged that this incident had occurred and that it should not have occurred and apologized for it; refused to give the contact information and training background for the driver; and failed to offer Kauders any form of compensation for what they acknowledged had happened.

31. On September 4, 2015, Kauders and his lawyer had a scheduled teleconference with Uber's "Employment Counsel," Dalene Bramer (a curious job title given that Uber claims that its drivers are not employees). Attorney Bramer did not state if Uber had taken or planned to take any action against the driver and she refused to disclose the driver's contact information.

32. On September 9, 2015, notwithstanding the fact that Uber had failed to take any actual steps to address this incident, Kauders received a computer generated email from Uber asking if he had been pleased with the service provided by one of the employees with whom he had spoken about the incident. This typifies Uber's cavalier attitude about this matter.

### Second Incident of Discrimination – December 30, 2015

33. On December 30, 2015, an Uber driver again refused to pick Kauders up because of his Seeing Eye dog. This incident occurred in front of Kauders's home, and the driver's initial refusal to pick up Kauders was witnessed by Plaintiff Hannah S. Kauders, and Plaintiff Lee C.S. Kauders who came outside soon afterwards.

6

34. Kauders then contacted the Newton, Massachusetts police, and the driver waited at the scene until an officer responded.

35. The driver still refused to give Kauders a ride when he was asked, but not ordered, to do so by the Newton police officer. The officer filed an incident report (*see* Exhibit A attached hereto), but no citation was issued to the Uber driver.

36. For several minutes, the driver unsuccessfully attempted to reach someone at Uber to ask if he was required to give Kauders a ride and was clearly frustrated by his inability to contact Uber.

37. In this sense, the driver clearly acted as though Uber had a supervisory role, and Kauders had the impression that the driver would have reluctantly given him a ride if he had reached Uber and they had instructed him to do so.

38. The driver stated that he had received no training regarding disability laws. He also firmly stated to Kauders, his daughter and the Newton police officer that he was not contractually obligated to give Kauders a ride.

39. The incident was humiliating for Kauders and its affect was exacerbated greatly by the fact that it played out in front of his wife and daughter. Having lost some of his self-confidence and fearing that he might once again be denied a ride by Uber, he asked his wife to give him a ride from West Newton to his office in downtown Boston. In addition, Seeing Eye dogs' training and ability to work safely can be affected by stressful situations and, in this instance, Wally was nervously whining while Kauders and the other witnesses talked to the driver. Finally, the incident made Kauders's wife and daughter very upset.

40. After the incident, Uber sent Kauders an automatically-generated email notifying him that he would be charged a $10 cancellation fee for this reservation, even though Kauders had

not canceled the ride. Interestingly, the $10 cancellation charge was reversed without Kauders having to complain to Uber. Instead, he received a follow-up email from an employee on Uber's "Disability Desk" named Cameron (with whom Kauders had previously spoken after the first incident), in which Cameron confirmed the cancelation reversal.

### Third Incident of Discrimination – March 25, 2016

41. On March 25, 2016, an Uber driver once again refused to pick Kauders up at his home because of his Seeing Eye dog.

42. On this occasion, Kauders ordered the ride in order to attend a medical appointment at Massachusetts Eye and Ear Infirmary in downtown Boston. The driver made the patently absurd claim that Wally was too big to fit in his car.

43. When Kauders asserted that it was illegal to refuse him service, the driver described himself as a "partner" of Uber and stated that he did not have to give Kauders a ride even though he acknowledged that Kauders had a disability.

44. The driver was clearly aware of the legal protections provided to Kauders but claimed they did not apply to him and acted as though Uber would support his argument.

### HARM TO KAUDERS AND HIS FAMILY

45. The cumulative effect of these incidents on Kauders has been overwhelmingly negative, and each new incident has exponentially increased the emotional distress.

46. The mere fact that Kauders was in constant fear that Uber's discrimination would be ongoing and affect his next ride represents a substantial emotional burden. But more significantly, Uber's action have undermined Kauders's independence and confidence. Wally and all of Kauders's previous guide dogs have provided him with a degree of independence that would have been unthinkable in their absence and have helped Kauders fulfill his responsibilities

8

as a spouse, parent and professional. His guide dogs have been a fundamental facet of Kauders's identity, and by effectively rendering Wally obsolete, Uber has directly attacked Kauders's confidence and sense of self. The fact that one of these incidents played out in front of his wife and daughter only compounded the humiliation.

47. The failure of Uber drivers to give Kauders rides and of Uber management to properly train drivers, to reprimand them for unlawful conduct, and to address incidents of discrimination in any meaningful way is particularly distressing to Kauders in light of his long history of advocating for the rights of blind individuals generally and guide dog users in particular. As a Board member of The Seeing Eye, Kauders has tirelessly supported its mission and now finds himself standing on curbs as Uber drivers leave him in the dust. Kauders also presently serves on the Boards of Mass Eye and Ear Infirmary, and the last two governors have appointed him to the Mass Commission Against Discrimination's (MCAD) Advisory Board. Nevertheless, Kauders is feeling increasingly helpless, as the taxi industry loses market share and Uber deprives him of his mobility, self-confidence, and emotion well-being.

48. Plaintiff Lee C.S. Kauders was deeply affected by witnessing her husband be humiliated in the incident of December 30, 2015. In addition, she has shouldered the burden of 100% of the personal driving throughout their 30-year marriage, and having to drive Kauders into Boston after Uber's refusal in the second incident, while a minor inconvenience in itself, nevertheless triggered feelings of frustration about having her husband not being treated respectfully.

49. Plaintiff Hannah S. Kauders finds incidents of discriminatory conduct against her father and Wally very upsetting, so witnessing the second incident was very difficult for her. She speaks Spanish fluently and was frustrated by her inability to convince the driver to give her

9

father and Wally a ride even when using the driver's native language.

## MCAD COMPLAINT

50. Kauders originally filed claims against Uber with MCAD on February 2, 2016.

51. MCAD determined that it could not undertake an investigation based on concerns about conflict of interest in light of Kauders's membership on the MCAD Advisory Board. Instead, as part of its Order, MCAD determined that the case was administratively closed, that Kauders had exhausted his administrative remedies, and that Kauders was immediately free to file a civil complaint in court (*see* Exhibit B attached hereto).

## COUNT I
### Violation of M.G.L. c, 272, § 98A
### (Christopher P. Kauders Against All Defendants)

52. The Plaintiffs repeat, reallege, and reaver the allegations in the preceding paragraphs and incorporate them by reference as if fully set forth herein.

53. As a guide dog user, Kauders was a member of the class protected by M.G.L. c. 272, § 98A each time Uber denied him service.

54. In all three instances when Uber denied Kauders service, it did so specifically because Kauders was using a guide dog.

55. As a direct and proximate result of Uber's violations of M.G.L. c, 272, § 98A, Kauders has suffered damages in an amount to be determined at trial.

56. Furthermore, the Defendants' blatant disregard for Kauders' rights on numerous occasions, coupled with their failure to take any steps to prevent such discrimination from occurring again, was outrageous conduct and entitles Kauders to an award of punitive damages in an amount to be determined at trial.

## COUNT II
### Intentional Infliction of Emotional Distress
(Christopher P. Kauders Against All Defendants)

57. The Plaintiffs repeat, reallege, and reaver the allegations in the preceding paragraphs and incorporate them by reference as if fully set forth herein.

58. Uber knew or should have known that by denying service to Kauders because of his guide dog on three separate occasions, by failing to properly train its driver regarding discrimination, and by failing to properly address the discriminatory incidents after they occurred, Kauders would suffer emotional distress.

59. This conduct was extreme and outrageous.

60. As a direct and proximate result of Uber's misconduct, Kauders in fact suffered severe emotional distress and is entitled to damages in an amount to be determined at trial.

## COUNT III
### Intentional Infliction of Emotional Distress
(Lee C.S. Kauders and Hannah S. Kauders Against All Defendants)

61. The Plaintiffs repeat, reallege, and reaver the allegations in the preceding paragraphs and incorporate them by reference as if fully set forth herein.

62. With respect to the second incident of discrimination described above, Uber knew or should have that denying service to Kauders because of his guide dog would cause emotional distress to family members who witnessed the incident and had to deal with its consequences, as Plaintiffs Lee C.S. Kauders and Hannah S. Kauders did.

63. This conduct was extreme and outrageous

64. As a direct and proximate result of Uber's misconduct, Lee C.S. Kauders and Hannah S. Kauders in fact sustained severe emotional distress and are entitled to damages in an amount to be determined at trial.

11

## COUNT IV
### Violations of M.G.L. 93A
### (All Plaintiffs Against All Defendants)

65. The Plaintiffs repeat, reallege, and reaver the allegations in the preceding paragraphs and incorporate them by reference as if fully set forth herein.

66. On April 28, 2016, the Plaintiffs served a demand letter pursuant to M.G.L. c. 93A, § 9 on Uber (*see* Exhibit C attached hereto).

67. Uber responded by letter of June 15, 2016 (extensions to the 30-day response deadline had been granted), in which it, *inter alia*, denied liability despite not contesting the facts of the discriminatory incidents in any way and attempted to downplay the impact of the discrimination by stating, "Kauders himself acknowledges that he has used the app to request 'more than 100' rides, and alleges that in only three instances from 2014 to the present did transportation providers refuse to accommodate him [*note – Kauders has made clear that only about 50 of these rides were with Wally*] . This does not equate to a *practice* of denying rides to blind individuals with service animals, nor does it demonstrate that Uber's policies and procedures are ineffective, much less unlawful." (*see* Exhibit D attached hereto).

68. The laws of the Commonwealth, including but not limited to Mass. Gen. Laws c. 272, § 98A, establish a framework of fair treatment of the disabled generally and individuals who use guide dogs specifically.

69. Uber's conduct in repeatedly denying Kauders service was plainly at odds with that statutory framework. It is also clear that Uber fails to make its drivers aware of their responsibilities under M.G.L. c. 272, § 98A and fails to properly address or even attempt to remedy incidents such as these, including the emotional distress suffered by family member witnesses. When a 60-year-old passenger with decades of experience traveling with a guide dog

requests an Uber ride on approximately 50 occasions and two drivers believed they were entitled not to pick him up while the third driver was unsuccessful in gaining clarification from headquarters regarding whether he was required to do so, it is clear that the design of Uber's operating procedures consistently frustrates the attempts of dog guide users to obtain rides. All of this conduct was unfair and deceptive under c. 93A.

70. Moreover, this conduct was undertaken willfully and knowingly. All three drivers were more than happy to directly state that the reason they were denying service was Kauders's guide dog, even after Kauders told each of them that they were legally prohibited from refusing him service on that basis.

71. As a direct and proximate result of Uber's misconduct, the Plaintiffs in fact sustained damages and are entitled to multiple damages, costs, and attorney's fees in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court enter the following relief:

1. Award damages to Christopher P. Kauders in an amount to be determined at trial, including compensatory and punitive damages.

2. Award damages to Lee. C.S. Kauders and Hannah S. Kauders in an amount to be determined at trial.

3. Award the Plaintiffs multiple damages for willful and knowing violations of M.G.L. c. 93A, § 9;

4. Award the Plaintiffs attorneys' fees and costs; and

5. Grant such other relief as the Court deems just and proper.

## JURY DEMAND

The Plaintiffs demand a trial by jury as to all issues so triable.

Dated:  July 12, 2016

The Plaintiffs.
CHRISTOPHER P. KAUDERS,
LEE C.S. KAUDERS, and
HANNAH S. KAUDERS
by their attorneys,

W. Paul Needham
BBO#368260
Mark A. Johnson
BBO#651271
Needham & Johnson
10 Liberty Square
Boston, MA 02109
(617) 482-0500
needhamandjohnson@nandjlaw.com

14

# EXHIBIT
# A



**NEWTON POLICE DEPARTMENT**
**NEWTON, MA**

INCIDENT # / REPORT #
15043228 / 0

## INCIDENT #15043228 DATA
As Of 12/30/2015 12:18:47

### BASIC INFORMATION

| CASE TITLE | LOCATION | APT/UNIT # |
|---|---|---|
| KAUDERS | 337 HIGHLAND AVE | |

DATE/TIME REPORTED
12/30/2015 08:49:24

DATE/TIME OCCURRED
12/30/2015 08:30 to 12/30/2015 08:49

INCIDENT TYPE/OFFENSE
ASSIST A CITIZEN

### PERSONS

| ROLE | NAME | SEX | RACE |
|---|---|---|---|
| INVOLVED PARTY | MUNERA, JORGE | MALE | WHITE |
| REPORTING PERSON | KAUDERS, CHRISTOPHER | MALE | WHITE |

[ NO OFFENDERS ]

### VEHICLES

| ROLE | TYPE | YEAR | MAKE | MODEL | COLOR | REG # | STATE |
|---|---|---|---|---|---|---|---|
| INVOLVED VEHICLE | | 2012 | NISSAN | SENTRA | BLACK | 1MCF70 | MA |
| STOLEN # | REC CODE | DATE REC | REC # | REC BY | | | |

[ NO PROPERTY ]

### OFFICER REPORT: 15043228 - 0 / LAZARAKIS Z (OFFICER)

| DATE/TIME OF REPORT | TYPE OF REPORT | REVIEW STATUS |
|---|---|---|
| 12/30/2015 08:49:24 | BASE REPORT | APPROVED |



# NEWTON POLICE DEPARTMENT
# NEWTON, MA

## INCIDENT DATA

| INCIDENT # | DATE/TIME REPORTED | | CLASSIFICATION TYPE |
|---|---|---|---|
| 15043228 | 12/30/2015 08:49 | | GENERAL INCIDENT |

---

## OFFICER REPORT: 15043228 - 1 / LAZARAKIS Z (OFFICER)

| DATE/TIME OF REPORT | TYPE OF REPORT | REVIEW STATUS |
|---|---|---|
| 12/30/2015 08:49:24 | INCIDENT | APPROVED |

---

### NARRATIVE

On Wednesday December 30 2015 at approximately 8:50 A.M. while working N492 I was dispatched to 377 Highland Avenue for a report of an Uber driver refusing to provide transportation to Mr. Kauders  and his service dog. It should be noted that Mr. Kauders is legally blind.

The Uber driver Mr. Jorge Munera  stated that he is afraid of dogs and that is the reason that he does not allow dogs in his vehicle.

I advised Mr. Kauders that this incident will be documented. Mr. Kauder's wife provided transportation for her husband.

# EXHIBIT
# B





## THE COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION
### ONE ASHBURTON PLACE, BOSTON, MA 02108-1518

**Charles D. Baker**
Governor

**Karyn E. Polito**
Lieutenant Governor

February 22, 2016

**Jamie R. Williamson**
Chairwoman

**Sunila Thomas George**
Commissioner

**Charlotte Golar Richie**
Commissioner

Christopher Kauders, Esq.
337 Island Ave.
West Newton, MA 02465

Re:  MCAD Docket No.: 16BPA00226  ("Complaint")

Dear Attorney Kauders:

      This letter will follow up on our conversation today regarding the Complaint filed on February 2, 2016 with the Massachusetts Commission Against Discrimination ("MCAD") concerning Uber. Due to your membership on the MCAD Advisory Board, the Commissioners are concerned about the appearance of a conflict of interest in investigating your Complaint. As a result, the MCAD will not undertake the investigation of your Complaint and it will be administratively closed. Please be advised that the MCAD views your filing of the Complaint as an exhaustion of administrative remedies, and a civil suit may immediately be filed in Court on your behalf.

      Thank you for your attention to this matter.

Regards,

Constance M. McGrane
General Counsel

Cc: Yaw Gyebi, Jr., Esq., Acting Chief of Enforcement

Tel: (617) 994-6000      TTY: (617) 994-6196      Fax: (617) 994-6024

# COMMONWEALTH OF MASSACHUSETTS
# COMMISSION AGAINST DISCRIMINATION

CHRISTOPHER KAUDERS,
Complainant

v.                                    DOCKET NO. 16-BPA-00226

UBER,
Respondent

## ORDER

On February 2, 2016, Complainant Christopher Kauders filed a Complaint alleging that Respondent Uber discriminated against him on the basis of his disability in violation of M.G.L. c. 272, § 98A.

Due to Mr. Kauders' membership on the MCAD Advisory Board, the Commission is concerned about the appearance of a conflict of interest in investigating his Complaint. As a result, the MCAD will not undertake an investigation of his Complaint, and the Complaint is hereby administratively closed.

Filing of the Complaint is considered as an exhaustion of administrative remedies in this matter, and a civil suit may immediately be filed in Court by the Complainant.

So Ordered, this ___29th___ day of _February_ 2016.

_Charlotte Golar Richie_
Charlotte Golar Richie
Investigating Commissioner

# EXHIBIT
# C

NEEDHAM & JOHNSON

ATTORNEYS AT LAW

10 LIBERTY SQUARE

BOSTON, MASSACHUSETTS 02109

TEL (617) 482-0500

FAX (617) 482-0456

W. PAUL NEEDHAM P.C.
MARK A. JOHNSON

April 28, 2016

**VIA CERTIFIED MAIL**

Uber Technologies, Inc.
1455 Market St., 4th Floor
San Francisco, CA 94103

Rasier, LLC
1455 Market St., 4th Floor
San Francisco, CA 94103

Care of its resident agent
for service in Massachusetts:

Care of its resident agent
for service in Massachusetts:

C T Corporation System
155 Federal St., Suite 700
Boston, MA 02110

C T Corporation System
155 Federal St., Suite 700
Boston, MA 02110

Re:   **Demand for Relief Pursuant to M.G.L. c. 93A, § 9, as relates to:
Christopher P. Kauders, Lee C.S. Kauders, and Hannah C. Kauders**

To Whom It May Concern:

We represent Christopher P. Kauders, a legally blind customer of Uber Technologies, Inc. and/or Rasier, LLC (hereinafter collectively "Uber") from West Newton, Massachusetts, as well as his wife, Lee C.S. Kauders, and his adult daughter, Hannah C. Kauders. Christopher Kauders has, on three separate occasions, been denied service by Uber drivers because the drivers have refused to allow Kauders's Seeing Eye guide dog into their Uber vehicles. His wife and daughter have witnessed one of these incidents. Please consider this letter a demand for relief pursuant to the provisions of Mas. General Laws, Chapter 93A, Section 9 (the Consumer Protection Act) based on Uber's willful and knowing use of unfair discriminatory trade practices.

Kauders originally filed claims against Uber with the Massachusetts Commission Against Discrimination (MCAD), but MCAD determined that it could not undertake an investigation based on concerns about conflict of interest in light of Kauders's membership on the MCAD Advisory Board. Instead, as part of its Order, MCAD determined that the case was administratively closed, that Kauders had exhausted his

administrative remedies, and that Kauders was immediately free to file a civil complaint in court (see Exhibit A).

## FACTUAL BACKGROUND

Kauders is legally blind and uses a Seeing Eye dog named Wally. He has been registered as legally blind with the Massachusetts Commission for the Blind since the 1960's and his low vision prevents him from qualifying for a driver's license.

Kauders has been licensed to practice law in Massachusetts since 1981. He is an arbitrator and mediator at Pre-Trial Solutions, Inc., at 10 Liberty Square, 5th Floor, Boston, MA 02109. Kauders relies on Uber on weekdays to travel to scheduled arbitrations and mediations outside of Boston, in the evening when he and his wife need to get from their home to locations in Boston, and on weekends.

Kauders opened an account with Uber in 2014, at which time Uber required submission of his credit card information. Uber has accepted payment from Kauders for more than 100 rides. Wally assisted Kauders during approximately half of those rides. The other rides took place either during the months when Kauders used a cane while waiting to train with Wally after the death of his previous Seeing Eye dog or during evenings when he used a cane while accompanied by his wife. Interestingly, Kauders experienced no unlawful discrimination while traveling with his cane. Kauders has been told by a few drivers that he has a high star rating and, therefore, is considered a desirable customer.

Kauders has used Uber to travel to scheduled arbitration and mediation sessions as far from Boston as Haverhill, MA, near the New Hampshire border. Public transportation is often not feasible and Uber's service is significantly less expensive than paying for a taxi to a distant location.

While traveling in Uber vehicles, Kauders has been accompanied by his Seeing Eye dog, Wally. Kauders is an experienced guide dog user, and has traveled with the assistance of a guide dog for 37 years. Wally was trained at the Seeing Eye, which is an accredited guide dog school and is the oldest guide dog school in the world.

## UBER'S UNFAIR AND DECEPTIVE PRACTICES

As set forth in detail below, Uber drivers have, on three separate occasions, refused to allow Kauders to enter their vehicles because he uses a guide dog.

Mass. Gen. Laws c. 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws c. 93A, § 2. Unfair conduct includes that which falls "within any recognized or established common law or statutory concept of unfairness." *VMark Software v. EMC Corp.*, 37 Mass. App. Ct. 610, 620 (1994).

2

Mass. Gen. Laws c. 272, § 98A specifically prohibits discrimination against individuals who use guide dogs and provides as follows:

> Notwithstanding any other provision of law, any blind person, or deaf or hearing handicapped person, or other physically handicapped person accompanied by a dog guide, shall be entitled to any and all accommodations, advantages, facilities and privileges of all public conveyances, public amusements and places of public accommodation, within the commonwealth, to which persons not accompanied by dogs are entitled, subject only to the conditions and limitations applicable to all persons not accompanied by dogs, and no such blind person, or deaf or hearing handicapped, or other physically handicapped person shall be required to pay any charge or fare for or on account of the transportation on any public conveyance for himself and such dog so accompanying him in addition to the charge or fare lawfully chargeable for his own transportation. Whoever deprives any blind person, or deaf or hearing handicapped person, or other physically handicapped person of any right conferred by this section shall be punished by a fine of not more than three hundred dollars and shall be liable to any person aggrieved thereby for such damages as are set forth in section five of chapter one hundred and fifty-one B; provided, however, that such civic forfeiture shall be of an amount not less than one hundred dollars.

By repeatedly denying Kauders service, Uber has plainly violated a statute that has as its primary purpose ensuring the fair treatment of individuals who use guide dogs. Moreover, beyond simply being unfair, this conduct has been undertaken willfully and knowingly. All three drivers were more than happy to directly state that the reason they were denying service was Kauders's guide dog, even after Kauders told each of them that they were legally prohibited from refusing him service on that basis. Willful and knowing violations of Chapter 93A make a party potentially liable for double or triple damages and attorney's fees. *See* c. M.G.L. c. 93A, § 9.

The three incidents in question are as follows:

### Incident of August 26, 2015

At or about 8:23 p.m. on August 26, 2015, Kauders used his iPhone to request an Uber pick up at the University Club of Boston, 426 Stuart St., Boston. Uber vehicles had picked Kauders up at that location on other occasions, and Kauders was familiar with the process of exiting the building and entering the car with the assistance of Wally.

A few minutes after the request, Uber notified Kauders, via smart phone, that the driver had arrived and that he was driving a black Toyota, license plate 4ELD80. Kauders and Wally then exited the building, at which point Kauders was greeted by two

acquaintances, Russell Goudreau and his son, Seth Goudreau, who are both attorneys, as well as the University Club's assistant general manager, Alex Noskovic. They advised him that the Uber vehicle was straight ahead.

After Wally led Kauders to the rear passenger door of the vehicle, Kauders realized that the window was down. He called through the window and greeted the driver. Kauders asked the driver to unlock the back door so he could enter.  On this warm summer evening, the three witnesses standing near Kauders on the sidewalk could easily hear the conversation, as both of the windows on the passenger side of the vehicle were rolled down.

In response to Kauders's request that the rear door be opened, the driver stated "this is my car. No dogs allowed." Kauders clearly advised the driver: that he was blind; that he was traveling with the assistance of a guide dog; and that the driver was legally required to give him a ride. After Kauders once again calmly requested that the driver unlock the door, the driver calmly and clearly repeated the same statement, that "this is my car. No dogs allowed." The three men on the sidewalk heard this conversation and calmly advised the driver that he was required by law to give Kauders a ride. The driver did not respond and shortly thereafter drove away.

This incident left Kauders humiliated in the presence of two other attorneys, both of whom regularly use Uber without difficulty.

During subsequent conversations between Kauders and four different Uber employees, the employees all: acknowledged that this incident had occurred and that it should not have occurred and apologized for it; refused to give the contact information and training background for the driver; and failed to offer Kauders any form of compensation for what they acknowledged had happened.

On September 4, 2015, Kauders and his lawyer had a scheduled teleconference with Uber's "Employment Counsel," Dalene Bramer (a curious job title given that Uber claims that its drivers are not employees). Attorney Bramer did not state if Uber had taken or planned to take any action against the driver and she refused to disclose the driver's contact information.

On September 9, 2015, notwithstanding the fact that Uber had failed to take any actual steps to address this incident, Kauders received a computer generated email from Uber asking if he had been pleased with the service provided by one of the employees with whom he had spoken about the incident. This typifies Uber's cavalier attitude about this matter.

### Incident of December 30, 2015

On December 30, 2015, an Uber driver again refused to pick Kauders up because of his Seeing Eye dog. This incident occurred in front of Kauders's home, and the

driver's initial refusal to pick Kauders was witnessed by Kauders's daughter, and his wife came outside soon afterwards.

Kauders then contacted the Newton, Massachusetts police, and the driver waited at the scene until an officer responded. The driver still refused to give Kauders a ride when he was asked, but not ordered, to do so by the Newton police officer. The officer filed an incident report (see Exhibit B attached hereto), but no citation was issued to the Uber driver.

For several minutes, the driver unsuccessfully attempted to reach someone at Uber to ask if he was required to give Kauders a ride and was clearly frustrated by his inability to contact Uber. In this sense, the driver clearly acted as though Uber had a supervisory role, and Kauders had the impression that the driver would have reluctantly given him a ride if he had reached Uber and they had instructed him to do so. The driver stated that he had received no training regarding disability laws. He also firmly stated to Kauders, his daughter and the Newton police officer that he was not contractually obligated to give Kauders a ride.

The incident was humiliating for Kauders and its affect was exacerbated greatly by the fact that it played out in front of his wife and daughter. Having lost some of his self-confidence and fearing that he might once again be denied a ride by Uber, he asked his wife to give him a ride from West Newton to his office in downtown Boston. In addition, Seeing Eye dogs' training and ability to work safely can be affected by stressful situations and, in this instance, Wally was nervously whining while Kauders and the other witnesses talked to the driver. Finally, the incident made Kauders's wife and daughter very upset.

After the incident, Uber sent Kauders an automatically-generated email notifying him that he would be charged a $10 cancellation fee for this reservation, even though Kauders had not canceled the ride. Interestingly, the $10 cancellation charge was reversed without Kauders having to complain to Uber. Instead, he received a follow-up email from an employee on Uber's "Disability Desk" named Cameron (with whom Kauders had previously spoken after the first incident), in which Cameron confirmed the cancelation reversal.

### Incident of March 25, 2016

Incredibly, on March 25, 2016, an Uber driver once again refused to pick Kauders up at his home because of his Seeing Eye dog. On this occasion, Kauders ordered the ride in order to attend a medical appointment at Massachusetts Eye and Ear Infirmary in downtown Boston. The driver made the patently absurd claim that Wally was too big to fit in his car. When Kauders asserted that it was illegal to refuse him service, the driver described himself as a "partner" of Uber and stated that he did not have to give Kauders a ride even though he acknowledged that Kauders had a disability. The driver was clearly

aware of the legal protections provided to Kauders but claimed they did not apply to him and acted as though Uber would support his argument.

Please note that Kauders, with the driver's permission, used his iPhone to record his conversation with the driver as this incident was occurring. A copy of that recording is being emailed, along with a copy of this letter, to Uber's attorney, Andrew Spurchise.

Taking all of these incidents together, it is clear that Uber has directly and repeatedly violated Mass. Gen. Law c. 272, § 98A; that it fails to make its drivers aware of their responsibilities under §98; and fails to properly address and even attempt to remedy incidents such as these. When a 60-year-old passenger with decades of experience traveling with a guide dog requests an Uber ride on approximately 50 occasions and two drivers believed they were entitled not to pick him up while the third driver was unsuccessful in gaining clarification from headquarters regarding whether he was required to do so, it is clear that the design of Uber's operating procedures consistently frustrates the attempts of dog guide users to obtain rides.

Any attempt by Uber to claim that it does not employ its drivers would have no basis. Uber's degree of control and, more importantly, right of control over its drivers, makes it vicariously liable for their actions. "The label placed by the parties on their relations is not dispositive, and subterfuges are not countenanced." *Peters v. Haymarket Leasing, Inc.*, 64 Mass. App. Ct. 767, 774 (2005), quoting *S.G. Borello & Sons v. Department of Industrial Relations*, 48 Cal.3d 341, 349 (1989). "It is the right to control, as opposed to actual control, that is determinative." *Id.*, citing *Dias v. Brigham Med. Assocs.*, 438 Mass. 317, 322-323 & n.8 (2002). "Even a very attenuated right of control may give rise to an employment relationship. *Id. Dias, 438 Mass. at* 322 and Restatement (Second) of Agency § 220 comment d.

Uber cannot avoid its obligations by trying to label its drivers as independent contractors. The Massachusetts independent contractor statute "establishes a standard to determine whether an individual performing services for another shall be deemed an employee or an independent contractor for purposes of our wage statutes." *Somers v. Converged Access, Inc.*, 454 Mass. 582, 589 (2009). Under this standard, "'an individual performing any service' is presumed to be an employee." *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 465 Mass. 607, 621 (2013), quoting M.G.L. c. 149, § 148B(*a*). That presumption can only be rebutted by satisfying the following three criteria:

"(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

"(2) the service is performed outside the usual course of the business of the employer; and

6

"(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."

In this case, Uber's control extends to all aspects of the driver-passenger dynamic, the drivers perform their work within the usual course of Uber's business, and, on information and belief, the vast majority of Uber drivers have not been customarily engaged in the business of commercial driving outside of the context of their service with Uber.

Regarding Uber's control, on the driver side, Uber plays a gatekeeping role in deciding who can act as a driver. It administers exams, runs criminal background checks, reviews driving records, licenses, vehicle registrations, and insurance, and requires prospective drivers to fill out various other forms. Then, when a candidate becomes a driver, Uber controls the transmission of trip requests to the driver and tightly regulates driver conduct and appearance, vehicle condition, and the payment procedure. Furthermore, Uber provides drivers with supplies and maintains commercial liability insurance in the event of driving-related claims. Finally, Uber has the exclusive right to terminate drivers – a right it exercises routinely for any number of reasons, such as poor customer ratings. On the passenger side, Uber controls who may even become a passenger by limiting the pool to prospective customers to those with credit cards and a smart phones that can properly run its App.

Uber is also liable as a principal for the actions of its drivers as its agents. "An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 431 Mass. 736, 742 (2000), citing *Kirkpatrick v. Boston Mut. Life Ins. Co.*, 393 Mass. 640, 645 (1985), citing Restatement (Second) of Agency § 1 (1958); Restatement (Second) of Agency, *supra* at §§ 14, 15 comments a, b. See also *Patterson v. Barnes*, 317 Mass. 721, 723 (1945). Uber's control of the drivers has already been detailed above, and there can be no doubt that, with the consent of each party, the drivers act on behalf of and for the benefit of Uber by performing the task by which Uber makes money, representing the company in so doing, and making reports to the company, including passenger ratings.

Also of note: Uber's email advertisement of March 1, 2016 featured a picture of a blind man with a cane and ad text proclaiming the convenience of Uber for blind customers. Kauders and many others with guide dogs certainly have not found that to be the case. Uber's ad department and attorneys were clearly aware of the complaints against Uber filed by guide dog users nationwide. This ad could have stated that its services were helpful to all blind customers, including those with guide dogs. Instead, they featured an individual with a cane and no pictorial text reference of guide dogs appeared, thereby perpetuating the unwillingness of Uber to support blind customers with guide dogs.

### Harm to Kauders and his Family

The cumulative effect of these incidents on Kauders has been overwhelmingly negative, and each new incident has exponentially increased the emotional distress. For starters, the mere fact that Kauders is in constant fear that Uber's discrimination will be ongoing and affect his next ride is a substantial emotional burden. But more significantly, Uber's action have undermined Kauders's independence and confidence. Wally and all of Kauders's previous guide dogs have provided him with a degree of independence that would have been unthinkable in their absence and have helped Kauders fulfill his responsibilities as a spouse, parent and professional. Brian McGrory, Editor of the Boston Globe, wrote an entire column (see Exhibit C attached) devoted to Kauders's love of his Seeing Eye dog and the guide dog's positive impact on his life. His guide dogs have been a fundamental facet of Kauders's identity, and by effectively rendering Wally obsolete, Uber has directly attacked Kauders's confidence and sense of self. The fact that one of these incidents played out in front of his wife and daughter only compounded the humiliation.

The failure of Uber drivers to give Kauders rides and of Uber management to properly train drivers and to reprimand them for unlawful conduct is particularly distressing to Kauders in light of his long history of advocating for the rights of blind individuals generally and guide dog users in particular. As a Board member of The Seeing Eye, Kauders has tirelessly supported its mission and now finds himself standing on curbs as Uber drivers leave him in the dust. Kauders also presently serves on the Boards of Mass Eye and Ear Infirmary, and the last two governors have appointed him to the Mass Commission Against Discrimination's Advisory Board. Nevertheless, Kauders is feeling increasingly helpless, as the taxi industry loses market share and Uber deprives him of his mobility, self-confidence, and emotion well-being.

Kauders's wife has shouldered the burden of 100% of the personal driving throughout their 30-year marriage. Having to drive him into Boston after Uber's refusal in the second incident, while a minor inconvenience in itself, nevertheless triggered feelings of frustration about having her husband not being treated respectfully. Kauders's daughter, Hannah, finds incidents of discriminatory conduct against her father and Wally very upsetting, so witnessing the second incident was very difficult for her. She speaks Spanish fluently and was frustrated by her inability to convince the driver to give her father and Wally a ride even when using the driver's native language. This experience was so upsetting that she told her father that she would be even more upset if she heard the recording of the third incident. The attached photograph of Hannah and Wally (Exhibit D) was taken last summer and shows you how fond this only child is of Wally, who she thinks of as her little brother.

Chapter 93A Demand Letter – Kauders to Uber/Rasier
Date: April 28, 2016
Page 9

---

## Demand

For all of the foregoing reasons, Kauders and his wife and daughter hereby demand from Uber two hundred fifty thousand dollars ($250,000) in exchange for a final settlement and release.

Section 9 of Chapter 93A requires you to formally respond to this letter in good faith within thirty (30) days. Failure to respond in good faith creates an independent basis for an award of double or triple damages, attorneys' fees and costs.

We look forward to your response.

Very truly yours,

W. Paul Needham

WPN/mla
Enclosures

cc:     Andrew M. Spurchise, Esq. (via email)

# EXHIBIT
# A



**THE COMMONWEALTH OF MASSACHUSETTS**
**COMMISSION AGAINST DISCRIMINATION**
**ONE ASHBURTON PLACE, BOSTON, MA 02108-1518**



Charles D. Baker
Governor

Karyn E. Polito
Lieutenant Governor

February 22, 2016

Jamie R. Williamson
Chairwoman

Sunila Thomas George
Commissioner

Charlotte Golar Richie
Commissioner

Christopher Kauders, Esq.
337 Island Ave.
West Newton, MA 02465

Re:  MCAD Docket No.: 16BPA00226  ("Complaint")

Dear Attorney Kauders:

This letter will follow up on our conversation today regarding the Complaint filed on February 2, 2016 with the Massachusetts Commission Against Discrimination ("MCAD") concerning Uber. Due to your membership on the MCAD Advisory Board, the Commissioners are concerned about the appearance of a conflict of interest in investigating your Complaint. As a result, the MCAD will not undertake the investigation of your Complaint and it will be administratively closed. Please be advised that the MCAD views your filing of the Complaint as an exhaustion of administrative remedies, and a civil suit may immediately be filed in Court on your behalf.

Thank you for your attention to this matter.

Regards,

Constance M. McGrane
General Counsel

Cc: Yaw Gyebi, Jr., Esq., Acting Chief of Enforcement

# COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION

CHRISTOPHER KAUDERS,
Complainant

v.                                    DOCKET NO. 16-BPA-00226

UBER,
Respondent

## ORDER

On February 2, 2016, Complainant Christopher Kauders filed a Complaint alleging that Respondent Uber discriminated against him on the basis of his disability in violation of M.G.L. c. 272, § 98A.

Due to Mr. Kauders' membership on the MCAD Advisory Board, the Commission is concerned about the appearance of a conflict of interest in investigating his Complaint. As a result, the MCAD will not undertake an investigation of his Complaint, and the Complaint is hereby administratively closed.

Filing of the Complaint is considered as an exhaustion of administrative remedies in this matter, and a civil suit may immediately be filed in Court by the Complainant.

So Ordered, this ___29th___ day of ___February___ 2016.

Charlotte Golar Richie
Investigating Commissioner

# EXHIBIT
# B



## NEWTON POLICE DEPARTMENT
### NEWTON, MA

**INCIDENT # / REPORT #**
15043228 / 0

---

## INCIDENT #15043228 DATA
As Of 12/30/2015 12:18:47

**BASIC INFORMATION**

**CASE TITLE**
KAUDERS

**LOCATION**
337 HIGHLAND AVE

**APT/UNIT #**

**DATE/TIME REPORTED**
12/30/2015 08:49:24

**DATE/TIME OCCURRED**
12/30/2015 08:30 to 12/30/2015 08:49

**INCIDENT TYPE/OFFENSE**
ASSIST A CITIZEN

---

**PERSONS**

| ROLE | NAME | SEX | RACE |
|---|---|---|---|
| INVOLVED PARTY | MUNERA, JORGE | MALE | WHITE |
| REPORTING PERSON | KAUDERS, CHRISTOPHER | MALE | WHITE |

[ NO OFFENDERS ]

---

**VEHICLES**

| ROLE | TYPE | YEAR | MAKE | MODEL | COLOR | REG # | STATE |
|---|---|---|---|---|---|---|---|
| INVOLVED VEHICLE | | 2012 | NISSAN | SENTRA | BLACK | 1MCF70 | MA |
| STOLEN # | REC CODE | DATE REC | REC # | REC BY | | | |

[ NO PROPERTY ]

---

## OFFICER REPORT: 15043228 - 0 / LAZARAKIS Z (OFFICER)

**DATE/TIME OF REPORT**
12/30/2015 08:49:24

**TYPE OF REPORT**
BASE REPORT

**REVIEW STATUS**
APPROVED



## NEWTON POLICE DEPARTMENT
## NEWTON, MA

### INCIDENT DATA

| INCIDENT # | DATE/TIME REPORTED | | CLASSIFICATION TYPE |
|---|---|---|---|
| 15043228 | 12/30/2015 08:49 | | GENERAL INCIDENT |

---

**OFFICER REPORT: 15043228 - 1 / LAZARAKIS Z (OFFICER)**

| DATE/TIME OF REPORT | TYPE OF REPORT | REVIEW STATUS |
|---|---|---|
| 12/30/2015 08:49:24 | INCIDENT | APPROVED |

**NARRATIVE**

On Wednesday December 30 2015 at approximately 8:50 A.M. while working N492 I was dispatched to 377 Highland Avenue for a report of an Uber driver refusing to provide transportation to Mr. Kauders and his service dog. It should be noted that Mr. Kauders is legally blind.

The Uber driver Mr. Jorge Munera stated that he is afraid of dogs and that is the reason that he does not allow dogs in his vehicle.

I advised Mr. Kauders that this incident will be documented. Mr. Kauder's wife provided transportation for her husband.

# EXHIBIT
# C

BRIAN MCGRORY
# A dog's guidance

By Brian McGrory, Globe Columnist | May 10, 2005

Chris Kauders still remembers the day as if it were yesterday, walking out of his downtown office into a pelting rain, telling Rudy they were heading to South Station for the train ride home and Rudy getting a better idea.

Where they were supposed to turn left, Rudy tugged him right, and Kauders felt himself on an unfamiliar course, weaving amid the frenzy of Boston traffic.

"I didn't know what he was doing," Kauders said with a laugh yesterday. "Then I heard a man say, 'Hey, mister, your dog wants you to get in the cab.' "

So Kauders got in the cab, and man and dog got home faster and drier because of it.

That's just one of a thousand stories that Kauders, who is blind, could tell of the decade he spent with a particularly amazing German shepherd guide dog named Rudy.

Chris and Rudy. Together, they traversed this city -- actually, this country -- every day in every possible way, on trains, in airplanes, and on foot. Put aside, for a moment, the logistics of it all. What Rudy really helped Chris with were the vagaries and intricacies of a full and rewarding life.

Kauders is a lawyer, a father, and a husband to a loving woman named Lee. He knows that but for Rudy's guidance, he wouldn't have achieved the same success in any of the above. Indeed, picture Kauders carrying Hannah on his shoulders to her school each morning, Rudy guiding the two of them along the way. Picture Kauders walking the family's terrier around their neighborhood, Rudy patiently walking them both. Picture Rudy lying by the side of the gymnasium pool, staring intently as his master swam his regular laps.

"He helped me raise my daughter," Kauders said. "He helped me be a real part of my family."

And more. Rudy was so much a part of the family that Hannah would dash off letters of complaint to cab companies whose drivers wouldn't let him in their cars.

He was a playmate to the cat, a confidant to Lee. But always, he had one eye on Kauders, eagerly jumping to attention when he reached for the keys. Kauders laughed again when he recalled the nose marks Rudy left on the window of his office conference room as he constantly peered inside to make sure his master was all right.

In the beginning, it wasn't easy. Trust is built on time.

But as months became years, commands barely needed to be spoken. They zigzagged like dancers along crowded Boston streets. When Rudy developed arthritis a couple of years ago, Kauders would help him into cars, a blind man hoisting up his 80-pound guide.

Rudy was scheduled to retire to the life of the family pet this July when his replacement will arrive. The pair was in Miami on a business trip late last month when Rudy woke up in distress. He could barely walk. He was having trouble breathing. Kauders and a kindly hotel worker rushed him to a nearby veterinarian.

A specialist diagnosed the problem as bacterial pneumonia and ordered an emergency blood transfusion. Before that occurred, 11-year-old Rudy died peacefully and unexpectedly in a clinic far from home.

The following morning, a blind man named Chris Kauders tentatively stepped off a plane at Logan Airport with the help of a cane he rarely used. He had flown out of town two days before in the company of a dog who was as much a part of his life as his hands or his legs. He returned with a harness and leash tucked mournfully in his luggage and with a badly broken heart.

Some days after, Hannah would watch her father slowly climb the stairs from the commuter train to the awaiting car, that unfamiliar cane tapping the ground, and shake her head at the scene. "When you were with Rudy," she said, "the two of you used to glide."

From the lips of an 11-year-old, something so very true. On the streets, in life, Chris and Rudy used to glide.

Brian McGrory is a Globe columnist. He can be reached at mcgrory@globe.com.■

© Copyright 2006 Globe Newspaper Company.

# EXHIBIT
# D

# EXHIBIT
# D



Littler Mendelson, PC
One International Place
Suite 2700
Boston, MA 02110

Carie A. Torrence
617.378.6035 direct
617.378.6000 main
617.249.1824 fax
ctorrence@littler.com

June 15, 2016

## CONFIDENTIAL – SETTLEMENT COMMUNICATIONS

**VIA ELECTRONIC MAIL**

W. Paul Needham
Needham & Johnson
10 Liberty Square
Boston, MA  02109

**Re:    Demand for Relief Pursuant to M.G.L. c. 93A, S 9, as it relates to:
Christopher P. Kauders, Lee C.S. Kauders, and Hannah C. Kauders**

Dear Attorney Needham:

Uber Technologies, Inc. ("Uber") and Rasier, LLC ("Rasier") have received your April 28, 2016 letter on behalf of Christopher Kauders, Lee C.S. Kauders and Hannah Kauders, seeking damages pursuant to Mass. G. L. c. 93A.  As I represent Uber and Rasier in this matter, please direct all future correspondence to my attention.

**The Consumer Protection Act Does Not Apply Here**

As an initial matter, the Kauders Family is not entitled to relief under 93A because, as held in *Joyce v. Town of Dennis*, 705 F.Supp.2d 74 (D.Mass. 2010), violations of Massachusetts' Public Accommodations Law (the "MPA") do not constitute "unfair or deceptive practices" sufficient to trigger 93A.

In *Joyce*, plaintiff brought claims under the Equal Rights Clause, the MPA, and 93A, alleging gender discrimination based on defendants' refusal to allow her to play in a men's-only golf tournament.  Importantly, the court entered summary judgment for defendants on plaintiff's 93A claim.  In so holding, the court determined that discrimination was not the type of "immoral, unethical, oppressive, or unscrupulous" conduct meant to fall within Chapter 93A's "unfair and deceptive" proscription.[1] *Id.* at 85 (internal citations omitted).  The court further held that, even if the alleged discrimination *did* amount to "unfair and deceptive" conduct,

---

[1] In determining whether conduct qualifies as an "unfair and deceptive practice" sufficient to state a claim under 93A, "courts [are] guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act." M.G.L. c. 93A, § 2(a).  Notably, no FTC or federal court decisions have found that conduct similar to that alleged here amounts to a deceptive or unfair trade practice.

W. Paul Needham
June 15, 2016
Page 2

plaintiff's 93A claim would still fail because she was "not without an alternative method of obtaining relief." The court stated:

> The fact that Massachusetts has a statute to cover precisely the conduct alleged here (i.e., a distinction or discrimination in a place of public accommodation) weighs against expanding the reach of 93A to accomplish an identical task. . . . *[93A's] applicability to [a public accommodation] dispute is tenuous at best.* Thus, although the same conduct obviously can give rise to liability under more than one law, *the existence and aptness of [the MPA] strongly mitigates against imposing liability under Chapter 93A.*

*Id.* (emphasis supplied).

Although confident in its position that 93A does not apply, Uber responds to the Demand to both clarify its position and, more importantly, to reassure the Kauders Family of Uber's commitment to increasing the mobility and independence of riders with service animals.

**About Uber Technologies, Inc.**

Uber is a San Francisco-based technology company that acts as a conduit between riders and independent transportation providers. Specifically, through its smartphone application (the "app"), Uber enables riders to request services from nearby transportation providers using wireless internet, global positioning systems, and other technologies. Uber provides the app to independent transportation providers solely as a referrals and payment processing resource. Uber does not own, lease, or operate any vehicles for transporting riders. As discussed in detail below, Uber does not employ the independent transportation providers who use the app or control or direct them in their performance of services for riders.

Additionally, before riders may use the Uber app to request rides from independent transportation providers, they must first accept Uber's User Terms and Conditions, which make clear that Uber itself does not provide any transportation services itself:

> The Services constitute a technology platform that enables users of Uber's mobile applications or websites provided as part of the Services (each, an "Application") to arrange and schedule transportation and/or logistics services with third party providers of such services, including independent third party transportation providers and third party logistics providers under agreement with Uber or certain of Uber's affiliates ("Third Party Providers"). Unless otherwise agreed by Uber in a separate written agreement with you, the Services are made available solely for your personal, noncommercial use. **YOU ACKNOWLEDGE THAT UBER DOES NOT PROVIDE TRANSPORTATION OR LOGISTICS SERVICES OR FUNCTION AS A TRANSPORTATION CARRIER.**

(*See* https://www.uber.com/legal/terms/us/) (emphasis added).

W. Paul Needham
June 15, 2016
Page 3

The Terms and Conditions also include a dispute resolution provision that requires disputes to be resolved in binding arbitration. The Arbitration Agreement states, in relevant part, as follows:

> You agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation, validity thereof or the use of the Services . . . will be settled by binding arbitration between you and Uber . . . . You acknowledge and agree that you and Uber are each waiving the right to a trial by jury or to participate as a plaintiff or class in any purported class action or representative proceeding.

(*Id.*) When Mr. Kauders completed an online account to use the Uber app, he agreed to these Terms and Conditions. As such, if Mr. Kauders decides to pursue his claims notwithstanding the information provided in this letter, he will be required to bring them in binding arbitration.

**Independent Transportation Providers Are Not Employees**

Similar to riders, any independent transportation provider who wishes to access Uber's app to receive trip requests from riders must first enter into a "Technology Services Agreement" (the "Agreement") with Rasier. At its outset, the Agreement is explicit that Uber and the independent transportation provider are separate businesses entering into a contractual, rather than an employment, relationship:

> [T]he relationship between the parties . . . is solely that of independent contracting parties. The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Company and you; and (b) no joint venture, partnership, or agency relationship exists between Company and you.

The Agreement also expressly provides that Uber does not and may not direct or control the work of transportation providers:

> Company does not, and shall not be deemed to, direct or control you generally or in your performance under this Agreement specifically, including in connection with your provision of Transportation Services, your acts or omissions, or your operation and maintenance of your Vehicle. You retain the sole right to determine when, where, and for how long you will utilize the Driver App or the Uber Services. You retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Company's then-current cancellation policies. With the exception of any signage required by local law or permit/license requirements, Company shall have no right to require you to: (a) display Company's or any of its Affiliates' names, logos or colors on your Vehicle(s); or (b) wear a uniform or any other clothing displaying Company's or any of its Affiliates' names, logos or

W. Paul Needham
June 15, 2016
Page 4

colors.  You acknowledge and agree that you have complete discretion to provide
services or otherwise engage in other business or employment activities.

Thus, the transportation providers involved in the incidents described in the Demand were not
Uber employees and Uber is not legally responsible for their actions.  Your arguments to the
contrary are unavailing.  First, the Demand's reliance on the Massachusetts Independent
Contractor Law is misplaced as that statute applies only in the wage and hour context.  *See*
M.G.L. c. 149, § 148B.  In the discrimination context, the burden is on the plaintiff to prove the
existence of an employment relationship.  *See Weston v. Town of Middleborough*, 14 Mass. L.
Rep. 323, at **18-19 (Mass. Super. Ct. Feb. 15, 2002).  Regardless, the transportation
providers are independent contractors.

As demonstrated by the Agreement, Uber does not have the right to direct or control the
transportation provider's work.  Nor does Uber exercise any such control.  In that regard,
transportation providers are free to determine when to use the app, what rides to accept and
whether to engage in other opportunities or personal business in between rides.  In *Comm'r of
Div. of Unemployment Assistance v. Town Taxi of Cape Cod, Inc.*, the Massachusetts Court of
Appeals assessed analogous facts and found that taxi drivers were free from Town Taxis'
direction and control and therefore properly classified as independent contractors.  In reaching
this conclusion, the court noted that – like transportation providers here – the taxi drivers were
free to choose which shifts to work, were not obligated to respond to calls from Town Taxi, and
were free to engage in other work and perform personal business during their shifts.  68 Mass.
App. Ct. 426, 430 (2007).  As such, Uber does not exercise sufficient control over transportation
providers to give rise to an employment relationship.

### Uber's Commitment to Expanding Accessibility to Individuals with Disabilities

Uber understands that the Demand stems, in part, from Mr. Kauders' commitment to ensuring
fair treatment of the visually impaired.  Be reassured, Uber shares this commitment, and any
mistreatment of Mr. Kauders is directly contrary to Uber's express policies and practices.
Indeed, Uber's goal has always been to make transportation options more accessible to all
individuals, including those with disabilities.  Uber has taken numerous significant steps in this
regard.[2]  For some time, Uber has worked closely with the Open Doors Organization, a disability
advocacy group, to determine how best to expand accessibility for individuals with disabilities.
With respect to blind individuals, Uber has partnered with the National Federation of the Blind
to obtain feedback from the visually impaired community.  Through this partnership, Uber seeks
to further improve transportation options for blind individuals.

While Uber's control over independent transportation providers is necessarily limited, the
Company has also worked diligently to ensure that such independent professionals share and

---

[2] For additional information regarding Uber's efforts to improve accessibility for both riders and
transportation providers see: http://newsroom.uber.com/2015/07/serving-our-users/;
https://newsroom.uber.com/2015/07/greater-accessibility/;
https://newsroom.uber.com/2015/07/commitment-to-innovation-for-the-blind-and-low-vision-
community/; and https://newsroom.uber.com/2015/07/transportation-at-your-fingertips/.

W. Paul Needham
June 15, 2016
Page 5

further Uber's commitment to disabled riders.  Transportation providers who sign up to use the Uber app are provided with an informational video regarding accommodating riders with disabilities.  This video, created with the assistance of the Open Doors Organization, makes clear that transportation providers should accommodate riders with service animals.

The Technology Services Agreement also explicitly provides that transportation providers must transport riders with service animals:

> You understand and agree that you have a legal obligation under the Americans with Disabilities Act and similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections. Your knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement.  You agree that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where you state the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or the companion of a User alleges that you cancelled or refused a ride on the basis of a Service Animal.

Once a transportation provider has successfully created an Uber account and can accept ride requests via the app, they also periodically receive emails from Uber highlighting their independent obligations under applicable disability laws.  This email includes a link to review the informational video referenced above, which is always available online.  Additional information regarding the transportation of individuals with service animals is available to transportation providers via Uber's website.

Uber also maintains a Code of Conduct, which transportation providers are prompted to review during the sign up process.   The Code of Conduct specifically prohibits any type of discrimination in serving riders with disabilities.  The Code of Conduct states in relevant part as follows:

> Uber expects compliance with all state, federal and local laws governing the transportation of riders with disabilities. Violation of these laws, *including with respect to the use of service animals*, constitutes a breach of the parties' licensing  agreement. *Service animals must be accommodated in compliance with accessibility laws. Reports of refusing to transport a rider with a service animal may lead to deactivation of the Uber account.*

(*See* https://www.uber.com/legal/code-of-conduct/en/) (emphasis supplied).

To carry out the foregoing, Uber has created a special support team that handles claims of refusal of service based on disabilities.  With this dedicated team, Uber seeks to ensure that any complaints from riders are handled promptly and consistently.  As indicated in the Technology Services Agreement, Uber currently utilizes a two-strike policy.   If a rider reports that a

W. Paul Needham
June 15, 2016
Page 6

transportation provider refused service due to the presence of a service animal, the transportation provider's account is temporarily deactivated. Thereafter, a team member contacts both the rider and transportation provider to obtain additional details. A team member will then reiterate to the transportation provider that they have an independent legal obligation to accommodate blind riders with service animals. If there is a second similar incident the transportation provider will permanently lose access to Uber's technology platform.

There are thousands of independent transportation providers using the Uber app as a source of referrals in Massachusetts alone, and most trips are completed without incident. Indeed, Mr. Kauders himself acknowledges that he has used the app to request "more than 100" rides, and alleges that in only three instances from 2014 to the present did transportation providers refuse to accommodate him. This does not equate to a *practice* of denying rides to blind individuals with service animals, nor does it demonstrate that Uber's policies and procedures are ineffective, much less unlawful.

Nonetheless, Uber continues to develop policies and practices aimed at ensuring the lawful treatment of riders with service animals by transportation providers. Uber recently agreed to settle a lawsuit brought by the National Federation of the Blind, its California affiliate and individuals with service animals, to ensure that riders with service animals nationwide receive reliable access to transportation arranged through the Uber app and to effectively address any issues of discriminatory treatment.[3]

Under the agreement, Uber will require new transportation providers to expressly confirm that they have reviewed Uber's service animal policy and understand and agree to abide by the legal obligations described therein. Further, both new and existing drivers will be blocked from receiving trip requests through the app until they confirm, through an interactive popup, that they are willing to transport riders with service animals. Transportation providers who do not express such willingness will be blocked from the app and their contract with Uber will be terminated. Finally, Uber will send quarterly email reminders to all transportation providers reminding them of their legal obligation to transport riders with service animals.

In addition to the efforts set forth above, the agreement also provides for enhanced complaint procedures and a more stringent enforcement policy to better ensure access to riders with service animals. Uber will terminate its contractual relationship with any transportation provider who knowingly refuses to transport a rider because the rider is accompanied by a service animal. Uber will also terminate its contractual relationship with transportation providers if Uber receives plausible complaints on more than one occasion that a provider unlawfully refused to transport a rider with a service animal regardless of whether the transportation provider's refusal was knowing.

Finally, the agreement provides for comprehensive reporting and monitoring on a national scale. Uber will report relevant data regarding usage of the app by riders with service animals to both the National Federation for the Blind and an independent third-party who will separately

---

[3] The parties submitted the proposed settlement to the court on April 29, 2016.

W. Paul Needham
June 15, 2016
Page 7

evaluate Uber's compliance with the terms of the agreement. In addition, the National Federation for the Blind will administer a nation-wide compliance testing program deploying blind individuals with service animals to request and take trips using the Uber app.

Uber is confident that these policy enhancements will go a long way to ameliorate Mr. Kauders' concern that transportation providers will refuse to transport him or other riders with service animals in the future.

**Conclusion**

As the foregoing makes clear, any 93A claim brought against Uber by the Kauders Family will be dismissed pursuant to *Joyce*. Further, Uber will not be liable for any alleged refusal to accommodate Mr. Kauders, because it does not employ the transportation providers who refused to transport his service animal. Indeed, such a refusal is directly contrary to Uber's express policies.

REDACTED

Please do not hesitate to contact me at your convenience should you have any questions or concerns regarding any aspect of the above.

Sincerely,

Carie A. Torrence