UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER P. KAUDERS, ) | |
| LEE C.S. KAUDERS, AND ) | |
| HANNAH S. KAUDERS, ) | |
|     Plaintiffs ) | |
| ) | |
| v. ) | Case No. 1:16-cv-11659-FDS |
| ) | |
| UBER TECHNOLOGIES, INC. AND ) | |
| RASIER, LLC, ) | |
|     Defendants ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL
ARBITRATION AND DISMISS THE COMPLAINT**

The Plaintiffs hereby oppose Defendants' Motion to Compel Arbitration and Dismiss the

Complaint. Plaintiff Christopher P. Kauders is a legally blind Massachusetts resident and guide

dog user. On three separate occasions in 2015 and 2016, the Defendants refused to allow Mr.

Kauders into their transportation service vehicles because he uses a guide dog. Mr.

Kauders alleges, *inter alia*, that these refusals violated Mass. Gen. Laws ch. 272, § 98A.[1]

The Plaintiffs originally filed this case in Suffolk Superior Court, but the Defendants

removed it to this Court on diversity grounds.[2] The Defendants now seek to enforce a complicated,

seven-paragraph arbitration clause that is itself buried within an even longer set of Term and

Conditions (hereinafter the "Agreement") and thereby deprive the Plaintiffs of their fundamental

---

[1] Christopher Kauders also has claims for intentional infliction of emotional distress and violations of Mass. Gen. Laws ch. 93A. His wife and daughter, Lee C.S. Kauders and Hannah Kauders, who were present when the second act of discrimination occurred, also have claims for intentional infliction of emotional distress and violations ch. 93A.

[2] As the Plaintiffs noted in the Memorandum in Support of their pending Motion to Remand (ECF Doc. No. 8 n.3), the Defendants' removed the case despite having refused to disclose the names and addresses of the individual drivers involved in the incidents of discrimination, who, when added as parties, will almost certainly eliminate diversity jurisdiction. In additional to raising this issue with Uber prior to filing this case, last week Plaintiffs' counsel emailed Defendants' counsel and made the same request (*see* Exhibit A attached hereto). Yet the Defendants have still not revealed this information (or even responded by email), even though it is clearly subject to Rule 26 initial disclosure and it has long since been "practicable" for the Defendants to do so. *See* Local Rule 26.2(a).

constitutional right to a jury.[3] The Agreement was drafted by Defendant Uber Technologies, Inc. ("Uber") and did not appear on the Plaintiffs' iPhone screens in whole or in part during their registrations with Uber. As a practical matter, of course, consumers rarely, if ever, review these kinds of dense terms and conditions and have no meaningful opportunity to negotiate or object to them. *See Meyer v. Kalanick*, 2016 U.S. Dist. LEXIS 99921, *1 (S.D.N.Y. July 29, 2016) (commenting critically that "in the world of the Internet, ordinary consumers are deemed to have regularly waived [their right to a jury], and, indeed, to have given up their access to the courts altogether, because they supposedly agreed to lengthy 'terms and conditions' that they had no realistic power to negotiate or contest and often were no even aware of").

Nevertheless, Uber has convinced another session of this Court to enforce a version of the same arbitration clause (*see Cullinane v. Uber Techs., Inc*., 2016 U.S. Dist. LEXIS 89540 (D. Mass. July 11, 2016)). In the instant Motion, however, the Defendants ignore crucial distinctions between *Cullinane* and this case, as well as flaws in that Court's reasoning. Furthermore, the Plaintiffs raise here numerous issues that are fatal to the arbitration clauses that were either not addressed at all or not addressed as fully in the *Cullinane* opinion. In short, as set forth below, the parties did not form valid agreements, the arbitration clauses at issue do not cover the Plaintiffs' claims, the terms of the arbitration clauses make arbitration itself an illusory remedy in this case, and the arbitration clauses are unconscionable and therefore unenforceable.

## STANDARD OF REVIEW

"A party who is seeking to compel arbitration must demonstrate that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is

---

[3] Christopher Kauders and Lee Kauders registered with Uber at different times (on June 27, 2014, and May 13, 2015, respectively). For purposes of this Opposition, since the Plaintiffs lack any realistic way of contesting the accuracy of the versions of the Agreements purportedly in effect at those times and attached as exhibits to the Defendants' Motion and supporting declarations, the Plaintiffs rely on and cite those exhibits without conceding their accuracy.

bound by that clause, and that the claim asserted comes within the clause's scope." *Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011). (citation and internal quotation marks omitted). Arbitration agreements can be declared unenforceable, pursuant to Section 2 of the Federal Arbitration Act (the "FAA"), "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2010).

## ANALYSIS

### I. THRESHOLD ISSUES.

"Whether or not a dispute is arbitrable is typically a question for judicial determination." *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011). "Therefore, 'except where the parties clearly and unmistakably provide otherwise, it is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter.'" *Id.,* quoting *Granite Rock Co. v. International Bhd. of Teamsters*, 561 U.S. 287, 299 (2010).

The Defendants, citing *Cullinane,* contend that, because the arbitration clauses incorporate the rules of American Arbitration Association ("AAA"),[4] "questions of formation, the scope of the Arbitration Agreement, and any other defenses to arbitration that Plaintiffs might raise" must be referred to the arbitrator (ECF Doc. No. 16 p. 8). However, this Court is not bound by *Cullinane* and should not follow it on this point because Judge Woodlock omitted a crucial phrase when he quoted the relevant arbitration clause language as follows: "The arbitration will be administered

---

[4] The Defendants specifically rely on Rule 7(a), which provides, in relevant part, that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." See AAA Rules and Mediation Procedure Rules (2013).

by the [AAA Rules] then in effect…." *Id*. at *7, *9-*10. The ellipsis replaces the phrase "except as modified by this 'Dispute Resolution' section," which is significant because in the first sentence of the arbitration clause, Uber describes the disputes subject to arbitration as those "arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof." This language covers the same ground as AAA Rule 7(a) but is not identical and therefore modifies that rule. Whereas Rule 7(a) references "arbitrability of any claim or counterclaim" as a category that is both within the arbitrator's jurisdiction and distinct from questions of the "existence, scope, or validity" of the agreement, Uber failed to use the term "arbitrabilty" in the clauses at issue here. In *Bekele v. Lyft, Inc.*, 2016 U.S. Dist. LEXIS 104921 *6-*7 (D. Mass. August 9, 2016), this Court considered the arbitration clause that included a specific reference to "the arbitrability of any dispute," and, similar to AAA Rule 7(a), listed that category as distinct from questions of "the interpretation, enforceability, revocability, or validity of the Agreement." That is to say, where corporate drafters of adhesive terms and conditions have wanted to specifically reference "arbitrability," they have done so directly. Uber's failure to use that term here means the arbitration clauses do not "clearly and unmistakably" apply to threshold issues of arbitrability.

In any event, even if this Court were to follow *Cullinane* on this issue, the Defendants have overstated how narrow the Court's threshold inquiry would be. Even in *Cullinane*, Judge Woodlock reserved for the Court an extensive review of (A) the general validity of the Uber Agreement, including the circumstances of the formation of the Agreement; (B) the question whether the arbitration clause even covered the subject claims; and (C) an assessment of whether arbitration was an illusory remedy. In this case, the same inquiries give rise to the following issues:

A. **The Parties Did Not Form Valid Contracts**.

The Court must first determine "whether . . . there exists a written agreement to arbitrate." *Lenfest v. Verizon Enter. Sols., LLC*, 52 F. Supp. 3d 259, 262-63 (D. Mass. 2014). "This is the first step of the analysis because, if the contract containing the arbitration agreement was never binding on the plaintiffs, the arbitration clause cannot be enforced against them." *Cullinane* at *12. "To determine whether a valid agreement to arbitrate exists, federal courts generally 'apply ordinary state-law principles that govern the formation of contracts.'" *Bekele v. Lyft, Inc.*, 2016 U.S. Dist. LEXIS 104921 *14 (D. Mass. August 9, 2016), quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). "Under Massachusetts law, the formation of a contract requires a definite offer, acceptance, and consideration." *Id.* at *15, citing *Vadnais v. NSK Steering Sys. Am., Inc.*, 675 F. Supp. 2d 205, 207 (D. Mass. 2009). "Formation of a contract is judged by the objective conduct of the parties, rather than their subjective intent." *Id.*, citing *Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc.*, 68 Mass. App. Ct. 582, 596 n.35 (2007).

1. **Defendant Rasier, LLC was not a Signatory to the Purported Agreement Between Christopher Kauders and Uber and Cannot Enforce the Agreement.**

There is a complete lack of offer, acceptance, and consideration between Christopher Kauders and Defendant Rasier, LLC. When Mr. Kauders registered with Uber, the scope of the Agreement was defined as follows: "The terms and conditions stated herein (collectively, the 'Agreement') constitute a legal agreement between you and Uber Technologies, Inc., a Delaware corporation (the "Company")." (ECF Doc. No. 16-4 p. 2). That language was only later changed to add a reference to, *inter alia*, Uber's subsidiaries (ECF Doc. Nos. 16-5 p. 2 & 16-6 p. 2).

Addressing this issue defensively and only briefly in a footnote, the Defendants cite *Sourcing Unlimited, Inc. v. Asimco Intern.*, Inc., 526 F.3d 38, 47 (1st Cir. 2008) to support their

contention that "[a]s a wholly-owned subsidiary of Uber, Rasier LLC has full enforcement rights of the Arbitration Agreement, and Plaintiffs' claims as they apply to this entity are equally subject to mandatory arbitration." (ECF Doc. No. 16 p. 9 n.3). *Sourcing Unlimited* is distinguishable from the instant case, however, because the corporate plaintiff in that case (who was seeking to avoid compelled arbitration) asserted either contract claims or tort and statutory claims related to the same contract. *See id*. at 40-42 and n.2. Only because the claims were so intertwined with the contract and because the plaintiff was attempting to enforce its rights under the contract was the *Sourcing Unlimited* Court willing to compel arbitration of the claims against the non-signatory subsidiary defendant by means of equitable estoppel – a doctrine which the Court noted "precludes a party from enjoying rights and benefits under a contract while at the same time avoiding its burdens and obligations." *Id.* at 47, quoting *InterGen N.V.* v. *Grina*, 344 F.3d 134, 145 (1st Cir. 2003) (internal quotation marks omitted).

In this case, by contrast, Christopher Kauders is not seeking to enforce the terms of the Agreement. In fact, the Complaint does not reference the Agreement in any way. His claims arise out of acts of discrimination wholly unrelated to the Agreement. Significant in this regard is the fact that the Agreement, which was drafted by Uber, purports to exclude such situations. The Agreement applies only to the "Service" (initially defined as "any services supplied to you by the [Uber]") and the "Application" (initially defined as "downloading, installing or using any associated application supplied by [Uber] which purpose is to enable you to use the Service"), and it excludes the following from the definitions of both the "Service" and the "Application":

> THE COMPANY DOES NOT PROVIDE TRANSPORTATION SERVICES, AND THE COMPANY IS NOT A TRANSPORTATION CARRIER. IT IS UP TO THE THIRD PARTY TRANSPORTATION PROVIDER, DRIVER OR VEHICLE OPERATOR TO OFFER TRANSPORTATION SERVICES WHICH MAY BE SCHEDULED THROUGH USE OF THE APPLICATION OR SERVICE. THE COMPANY OFFERS INFORMATION AND A METHOD TO

OBTAIN SUCH THIRD PARTY TRANSPORTATION SERVICES, BUT DOES NOT AND DOES NOT INTEND TO PROVIDE TRANSPORTATION SERVICES OR ACT IN ANY WAY AS A TRANSPORTATION CARRIER, AND HAS NO RESPONSIBILITY OR LIABILITY FOR ANY TRANSPORTATION SERVICES PROVIDED TO YOU BY SUCH THIRD PARTIES.

Of course, the Plaintiffs will contest the Defendants' inevitable future attempts to enforce this clause, but its viability is beside the point for purposes of this Motion; the relevant point now is that Uber's self-drafted Agreement purportedly does not apply to the type of driver-rider interactions that give rise to Mr. Kauders' claims, so the Defendants cannot credibly assert that the same claims are so intertwined with the Agreement that Kauders should be equitably estopped from opposing compelled arbitration of his claims against the non-signatory Defendant Rasier.

Furthermore, by the Defendants' own admission, notwithstanding the Defendants' parent-subsidiary relationship, Rasier has a business purpose that is different from that of Uber in that Rasier "contracts with *transportation providers* to furnish them access to the Uber App." (ECF Doc. No, 16-1 ¶4) (emphasis supplied). The fact that Rasier is directly involved with the kinds of driver-related issues to which Uber disclaims any connection implicates an entirely distinct set of liability issues against Rasier and would make it all the more inappropriate and inequitable to allow Rasier to enjoy the benefits of an Agreement to which it was not even a signatory.[5]

### 2. The Plaintiffs Did Not Have Reasonable Notice of or Manifest an Assent to the Arbitration Clause.

As the party seeking to compel a contract of adhesion, the Defendants have the burden of proving "(1) that the arbitration provision was reasonably communicated to [the Plaintiffs], and

---

[5] The modified arbitration clause in Lee Kauders' Agreement does reference subsidiaries, but for the reasons set forth below, Lee Kauders' claims are even further removed from the Agreement. The Defendants also seek to enforce the Agreement against Hannah Kauders despite not even asserting that she signed an Agreement. As regards Rasier, this amounts to an attempted enforcement of a contract by a non-signatory against a non-signatory. The Plaintiffs are not aware of any authority for this proposition, and the Defendants certainly do not cite any such authority.

(2) that [the Plaintiffs] manifested assent to its terms." *Bekele*, *supra*, at *17, citing *Acher v. Fujitsu Network Commc'ns, Inc.*, 354 F. Supp. 2d 26, 36 (D. Mass. 2005); *see also Ajemian v. Yahoo!, Inc.*, 83 Mass. App. Ct. 565, 573-74 (2013). The Defendants have set forth screenshots of what the Plaintiffs purportedly saw when they registered with Uber. Of course, the Plaintiffs have no realistic way of contesting the Defendants' assertions absent discovery on this point. In few, if any, other contexts can parties effectively prevail on summary judgment on an issue with such a one-sided presentation. In any event, even if the registration process and screens were displayed as the Defendants contend, the Agreements are still not valid.

In this context, the distinction between online "clickwrap" and "browsewrap" agreements has been thoroughly reviewed by sessions of this Court and others and need not be restated here. *See, e.g., Bekele*, *supra*, at *18; *Cullinane*, *supra*, at *14-*17; *Berkson v. Gogo LLC*, No. 14-CV-1199, 97 F. Supp. 3d 359, 394-401 (E.D.N.Y. 2015). By all accounts, the Agreements at issue here were not clickwrap agreements because the Terms and Conditions were not displayed on Christopher and Lee Kauders' iPhone screens during their registrations and they were not required to affirmatively signal assent by clicking "I agree" before moving on from such a display. For their part, the Defendants fail to even employ these terms at all, presumably on the theory that *Cullinane* has made that distinction irrelevant, but that is not the case. The distinction was meaningful in *Ajemian v. Yahoo!, Inc.*, 83 Mass. App. Ct. 565, 573-74 (2013), and since state law controls this inquiry, it remains relevant to the disposition of this Motion.

*Cullinane* accepted the authority of state law in this context and the *Ajemian* case in particular, and it even conceded that "[t]he *Ajemian* court specifically concluded that the agreement before it was essentially a browsewrap agreement, and that the notice provided to the

users was insufficient to justify enforcement of the clauses in question." *Cullinane* at *18-*19. However, it proceeded to seemingly ignore the Appeals Court's concerns in *Ajemian*.

For instance, the *Ajemian* Court noted, in the context of forum-selection clauses in clickwrap contracts:

> Although forum-selection clauses contained in online contracts have been enforced, courts have done so only where the record established that the terms of the agreement were displayed, *at least in part*, on the user's computer screen and the user was required to signify his or her assent by *"clicking" "I accept."*

*Id*. at 576 (emphasis supplied). For the *Ajemian* Court, then, clickwrap agreements existed on one level, while anything short of that enjoyed significantly reduced status. There was no discussion in *Ajemian* of "hybrid" agreement or the like. An agreement either displays the terms on the screen "at least in part" or it does not. If, as here, there is no such display, *Ajemian* strongly suggested that that Agreement should be considered invalid, both for failure of reasonable notice to consumers and lack of manifestation of assent by them.

Finally, unaddressed by either the *Cullinane* Court or the Defendants here is the confusion a reasonable Uber registrant could experience by virtue of the nomenclature Uber uses to describe the steps of its own registration process, which are entitled, respectively, (1) "Create an Account," (2) "Create a Profile," and (3) "Link Payment." (*see generally* ECF Doc. No. 16-1). The reference to and hyperlink containing the "Terms and Conditions and Privacy Policy" appears for the first time only at Step Three, at which point the registrant is told that he agrees to the Terms and Conditions and Privacy Policy "By creating an Uber account." (*id*.). However, by this point, the registrant has already completed Step One labeled "Create an Account." Upon encountering the first reference to the Terms and Conditions at Step Three, therefore, it would be reasonable for a registrant to assume that he has already agreed to the Terms and Conditions by the act of creating an account in Step One. There would be no reason, in that scenario, for the registrant to review the

Terms and Conditions because he could reasonably assume that his own perceived prior assent would render any such review moot. That being the case, the clicking of the "Done" button after Step Three would not manifest any kind of assent at all.

**B. <u>The Arbitration Clause Does Not Cover the Plaintiffs' Claims.</u>**

Even if this Court were to follow *Cullinane* and find the Uber Agreements valid generally, there is an additional threshold inquiry, which Judge Woodlock alternatively described as determining whether "the arbitration clause is broad enough to encompass the issues in dispute and that the parties agreed to have the contract governed by the AAA Rules" or whether "the dispute falls within the scope of the arbitration provision." *Id*. at *27, *29-30. "[T]he fact that the parties have agreed to arbitrate some disputes does not necessarily manifest an intent to arbitrate every dispute that might arise between the parties …." *CardioNet, Inc. v. Cigna Health Corp*., 751 F.3d 165, 172 (3d Cir. 2014). "[W]hether a dispute falls within the scope of an arbitration clause depends upon the relationship between (1) the breadth of the arbitration clause and (2) the nature of the given claim." *Id.*

**1. Christopher Kauders' Claims Are Not Covered.**

While there was little doubt that the arbitration clause in *Cullinane* covered the plaintiffs' claims that Uber had overcharged them for tolls, since the claims were directly related to use of the service and Uber's Agreement, in this case, as set forth in the preceding section, Christopher Kauders is not seeking to enforce the Agreement. In fact, his discrimination claims arise out of driver-rider interactions that Uber specifically attempts to exclude from the Agreement, and his common law and ch. 93A claims are based on the same conduct and situations. For those reasons, Kauders' claims neither "arise out of" nor "relate to" the Agreement.

Regardless, in no event can the arbitration clauses be said to cover discrimination clauses in clear and unmistakable terms. In *Warfield v. Beth Israel Deaconess Medical Center, Inc*., 454 Mass. 390 (2009), the Massachusetts Supreme Judicial Court found, with respect to an admittedly valid employment agreement that contained an arbitration clause, that "[c]onsistent with the public policy against workplace discrimination reflected in [Mass. Gen. Laws ch. 151B], … an employment contract containing an agreement by the employee to limit or waive any of the rights or remedies conferred by Mass. Gen. Laws ch. 151B is enforceable only if such an agreement is stated in clear and unmistakable terms." *Id*. at 398. Accordingly, the *Warfield* Court held that "[the plaintiff's] statutory discrimination claims do not fall within the scope of the arbitration clause contained in the employment agreement." *Id*. at 391.

In *United States ex rel. Hagerty v. Cyberonics, Inc*., 146 F. Supp. 3d 337 (D. Mass. 2015), this Court rejected the applicability of *Warfield's* "clear and unmistakable" rule to arbitration clauses governed by the FAA because applying the rule "would not 'place [the arbitration agreement] upon the same footing as other contracts,'" and would contravene the presumption of arbitrability. *Id*. at 349, quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 527 & 532 (3d Cir. 2009*)*. However, this Court did not address the following caveat set forth in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 347 n.6 (2010), where the U.S. Supreme Court, even after rejecting a state rule concerning arbitrations of class actions, observed:

> Of course States remain free to take steps addressing the concerns that attend contracts of adhesion – for example, requiring class-action-waiver provisions in adhesive agreements to be highlighted. Such steps cannot, however, conflict with the FAA or frustrate its purpose to ensure that private arbitration agreements are enforced according to their terms.

If a state can invalidate an arbitration clause otherwise enforceable under the FAA based solely on a deficiency in the visual prominence of certain language (presumably in furtherance of a public

policy favoring notice to consumers), it is difficult to see how the same state would be forbidden under the FAA from upholding perhaps the most essential public policy by simply demanding clarity in drafting with respect to the inclusion of discrimination claims in arbitration clauses. Accordingly, this Court should apply *Warfield* and deny arbitration based on the Defendants' failure to include discrimination claims in the arbitration clause in clear and unmistakable terms.

### 2. Lee and Hannah Kauders' Claims Are Not Covered.

Plaintiff Lee Kauders' claims for intentional infliction of emotional distress and violations of Mass. Gen. Laws ch. 93A have even less of a connection to her Agreement with Uber. Her claims are based solely on having been present for the second incident of discrimination and have no relation to and certainly do not arise under the Agreement. She did not even request a ride from Uber that day. Plaintiff Hannah Kauders asserts the same legal claims, based on the same incident, and the Defendants do not even allege that her claims arise under an Agreement at all.

### C. <u>Arbitration Would be an Illusory Remedy in this Case</u>.

In *Cullinane,* Judge Woodlock recognized that even where a court would otherwise delegate gateway issues of arbitrability, "if the terms for getting an arbitrator to decide the issue are impossibly burdensome, that outcome would indeed raise public policy concerns." *Id*. at *27, quoting *Awuah v. Coverall N. Am., Inc*., 554 F.3d 7, 12 (1st Cir. 2009) (*Awuah I*) (internal quotation marks omitted). "In such cases, it is up to the court to determine if arbitration would be an illusory remedy under the circumstances." *Id*. In *Awuah I*, the First Circuit described the inquiry as "whether the arbitration regime here is structured so as to *prevent* a litigant from having access to the arbitrator to resolve claims, including unconscionability defenses." *Id.* at 13 (emphasis in original). One relevant factor is the existence of "excessive arbitration costs." *Id*. Costs were not an issue in *Cullinane*, as the plaintiffs' claim were for less than $75,000 and thus, pursuant to the

arbitration clauses at issue in *Cullinane* (and in this case, *see* ECF Doc. Nos. 16-4 p. 9 & 16-6 p. 11), Uber was required cover all arbitration costs. *Cullinane* at *28. Here, however, the Plaintiffs' claims are in excess of $75,000, as Uber conceded when it removed this case from Suffolk Superior Court to this Court and argued that the amount in controversy requirement had been satisfied (ECF Doc. No. 1 pp. 2-3). Thus, the Plaintiffs would be required to cover their arbitration costs, and those costs could be excessive given the number of procedural issues the arbitrator would potentially have to address, including extensive preliminary hearings, and the fact that any arbitration on the merits could last multiple days.[6]

Arbitration as a remedy is undermined even more directly by the fact that the arbitration clauses both make the same specific reference to the sprawling limitation of liability clauses that appear in both Christopher and Lee Kauders' Agreements (ECF Doc. Nos. 16-4 pp. 7-8 & 16-6 p. 8-9). While those two clauses contain different language, in broad terms they both purport to insulate Uber from all manner of damages and claims. Were this case to proceed in court, Uber would no doubt seek to enforce the purported limitation and the Plaintiffs would raise defenses. However, the arbitration clauses in both Agreements contain identical language that provides that "[t]he arbitrator's award [of] damages *must be consistent with* the terms of the 'Limitation of Liability' section above as to the types and the amounts of damages for which a party may be held liable." (ECF Doc. Nos. 16-4 p. 9 & 16-6 p. 11) (emphasis supplied). That language goes far beyond merely reminding the arbitrator of the clauses. Instead, it removes from the arbitrator any discretion to invalidate the clauses or even consider any defenses to their enforcement, including unconscionability. Since an arbitrator's award cannot be made "consistent with" a clause if that

---

[6] Furthermore, since the arbitrator is required to be a "retired judge or an attorney licensed to practice law in the state of California," there is the potential for additional travel and accommodations expenses associated with bringing an out-of-state arbitrator to Massachusetts to conduct the arbitration, as required, "in the country where [the Plaintiffs] reside." (ECF Doc. Nos. 16-4 p. 9 & 16-6 p. 10).

clause has already been invalidated, the subject arbitration clauses effectively foreclose such challenges in arbitration. This is the very definition of an arbitration being "structured so as to *prevent* a litigant from having access to the arbitrator to resolve claims, including unconscionability defenses." *Awuah I*, *supra*, at 13 (emphasis in original). At a minimum, the "must be consistent with" language is ambiguous and, as such, must be construed against Uber as the drafter of the Agreement. *Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 226 F.3d 15, 25 (1st Cir. 2000).

Finally, it is significant that both arbitration clauses, in their last paragraphs, incorporate by reference Uber's unilateral right to make modifications to the Agreement. *See Domenichetti v. Salter Sch.*, LLC, 2013 U.S. Dist. LEXIS 57201 *13-*14 (D. Mass. April 19, 2013) (noting that "courts have found the obligation to arbitrate unenforceable when the employer retains the unilateral right to change the terms of the agreement because such a right renders any recited promise illusory"), citing *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 206 (5th Cir. 2012); *Douglas v. Johnson Real Estate Investors, LLC*, 470 Fed. Appx. 823, 826 (11th Cir. 2012); *Dumais v. American Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002); *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir. 1999); *Canales v. Univ. of Phoenix, Inc.*, 854 F. Supp. 2d 119, 124 (D. Me. 2012). In *Bekele*, *supra*, at *39-*40 n.17, in the distinct but related context of a substantive unconscionability challenge to an arbitration agreement, this Court refused to consider the challenge because the modification provision was "not contained in the agreement's arbitration provision; rather it appear[ed] near of the beginning of the [terms of service]." Here, while there are general unilateral modification provisions near the beginning of the Agreements,[7] specific

---

[7] The general modification provision when Christopher Kauders registered with Uber was as follows:

> The Company reserves the right to modify the terms and conditions of this Agreement or its policies relating to the Service or Application at any time, effective upon posting of an updated version of

reference is also made to Uber's modification right within the arbitration clauses themselves.

Christopher Kauders' arbitration clause contains the following paragraph:

> Changes. Notwithstanding the provisions of the modification-related provisions above, if Company changes this "Dispute Resolution" section after the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement), you may reject any such change by sending us written notice (including by email to support@uber.com) within 30 days of the date such change became effective, as indicated in the "Last Updated Date" above after in the date of Company's email to you notifying you of such change. By rejecting any change, you are agreeing that you will arbitrate any Dispute between you and Company in accordance with the provisions of this "Dispute Resolution" section as of the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement).

(ECF Doc. No. 16-4 pp. 9-10). [8]

Uber will surely contend that the general unilateral modification right is limited by the language that establishes a procedure for consumers to opt out of arbitration-specific changes. However, this ignores the fact that in many instances terms used in the arbitration clauses ("the Company," "the Agreement" or "the Terms," "the Service," and "the Application," for example) are defined elsewhere in the Agreements (ECF Doc. Nos. 16-4 p. 2 & 16-6 p. 2), yet the opt-out provision, by its terms, only applies to changes made to the wording of the arbitration clauses themselves. There is nothing, in other words, to stop Uber from radically redefining those terms in a way that would substantially alter or eliminate rider rights with respect to arbitration, all without ever actually changing a word of the arbitration clause itself.

---

this Agreement on the Service or Application. You are responsible for regularly reviewing this Agreement. Continued use of the Service or Application after any such changes shall constitute your consent to such changes.

(ECF Doc. No. 16-4 pp. 2). The corresponding provision in Lee Kauders' Agreement was substantially similar (ECF Doc. No. 16-6 pp. 2-3).

[8] The corresponding clause in Lee Kauders' arbitration clause, while substantially similar, does contain some differences, including the omission or the reference to Uber even potentially emailing notices of modifications (ECF Doc. No. 16-6 p. 11).

It is also significant that there is no apparent limit on the retroactive application of such changes. In *Nat'l Fed'n of the Blind v. Container Store, Inc*., 2016 U.S. Dist. LEXIS 98067 *29- *35 (D. Mass. March 11, 2016), Magistrate Judge Kelley, applying a line of Texas and 5th Circuit cases, found an arbitration provision to be illusory because it was silent as to its possible retroactive effect. The Court first noted that "an arbitration clause is illusory if one party 'can avoid its promise to arbitrate by amending the provision or terminating it altogether.'" *Id*. at *29, quoting *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010). Under those cases, "[t]he crux of this issue is whether [one party] has the power to make changes to its arbitration policy that have retroactive effect, meaning changes to the policy that would strip the right of arbitration from [the other party] . . . ." *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012). The Court further noted that in *Morrison v. Amway Corp*, 517 F.3d 248 (5th Cir. 2008), which involved "Rules of Conduct" governing a distribution agreement that could be amended by publication by the defendant corporation, the Fifth Circuit held, with respect to an arbitration provision, that there was "nothing in any of the relevant documents which preclude[d] . . . elimination of the entire arbitration program or its applicability to certain claims or disputes so that . . . mandatory arbitration would no longer be available even as to disputes which had arisen and of which [the defendant] had notice prior to publication [of the change]." *Id*. at 253. Later, in *Carey*, *supra*, at 206-07, the Fifth Circuit held that "silence about the possible retroactive application of amendments to the arbitration policy [is] interpreted as allowing amendments to apply retroactively."

The clause at issue in *Nat'l Fed'n of the Blind, supra,* was similar to the one here except that it did not include the opt-out provision. However, upon closer examination, the opt-out "right" is in fact an added obligation on the rider that is itself illusory. First, while Christopher Kauders' arbitration clause references the possibility that changes would be emailed to him (again, Lee

Kauders' clause does not contain that language), there is no evidence that such emails were ever sent. Thus, the burden of becoming aware of changes is entirely on riders, meaning that riders must access the Agreement at least monthly, and, if an updated version has been published, read the lengthy and densely worded arbitration clause and compare it against the prior version for any changes buried in the legalese. Beyond that, the fact that so many terms used in the arbitration clauses are defined by language that appears elsewhere in the Agreement means that a rider would, as a practical matter, have to re-read the *entire* Agreement in each such instance to even have the chance of finding all the changes, let alone understanding them. The obligation to constantly review Uber's website for changes to the Agreement is also apparently open-ended and continues even if the Rider has stopped requesting rides from Uber. If, for instance, a rider has not requested a ride from Uber for one year, changes that Uber made to the arbitration clause shortly after the riders' last ride request would nevertheless be binding under the terms of the arbitration clause, that is unless the rider reviewed the arbitration clause for changes in the first month after his last ride request and opted out even though he was not otherwise using Uber's Service or App.

## II. THE ARBITRATION CLAUSES ARE UNENFORCEABLE BECAUSE THEY ARE UNCONSCIONABLE.

Assuming this Court properly reserves for itself the issue of enforceability of the arbitration clauses, it should declare the clauses unenforceable as unconscionable. Under Massachusetts law, "[u]nconscionability must be determined on a case-by-case basis, with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party . . . ." *Waters v. Min Ltd.*, 412 Mass. 64, 68 (1992). "[T]o prove that the terms of a contract are unconscionable, a plaintiff must show both substantive unconscionability (that the terms are oppressive to one party) and procedural unconscionability (that the circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice

and was subject to unfair surprise)." *Machado v. System4 LLC*, 471 Mass. 204, 218 (2015) (citations and internal quotation marks omitted). This issue is a question of law for the Court to decide. *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 291 (1980). The focus is on the unconscionability of the arbitration clause itself, as opposed to the agreement as a whole. *Hurlbut v. Gantshar*, 674 F. Supp. 385, 390 (D. Mass. 1987).

### A. <u>Procedural Unconscionability.</u>

Procedural unconscionability can result from unfair surprise or oppressive process in the formation of the contract. *Bekele*, *supra*, at \*33. "[U]nfair surprise might arise where the provision was 'obscurely worded,' 'buried in fine print in the contract,' or proposed under other circumstances suggesting unfairness." *Storie v. Household Int'l, Inc.*, 2005 WL 3728718, at \*9 (D. Mass. Sept. 22, 2005), quoting *Zapatha*, 381 Mass. at 293-94. Oppressive process occurs when the "circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice." *Id.*

In *Bekele* at \*34-\*38, this Court considered numerous factors in conducting its procedural unconscionability analysis. While the Court ultimately concluded that the contract at issue in that case was not procedurally unconscionable, most of the elements on which it focused are notably absent in this case. First, whereas the arbitration provision in *Bekele* was one paragraph long, the same provisions in this case are seven paragraphs long (ECF Doc. Nos. 16-4 pp. 8-10 & 16-6 pp. 9-11). Second, *Bekele* concerned a clickwrap agreement that required the plaintiff to affirmatively respond by clicking "I accept." As covered above, that is not the case here. Next, the plaintiff in *Bekele* accepted the clickwrap terms of service on three separate occasions, but the Plaintiffs in this case only clicked "Done" once. The *Bekele* Court also characterized the header to the arbitration clause there as a "clearly-worded, bolded, all-caps header in a font size that is larger than the text of the provision itself," whereas here, at least in Christopher Kauders' Agreement,

the header appears in lower case letters and, while bolded, is in the same font size as the seven paragraphs that follow it (ECF Doc. No. 16-4 p. 8). Finally, while the Court in *Bekele* was satisfied that the provision there used "fairly clear language," the fact that the provision was only one paragraph long has to have impacted that analysis; a seven-paragraph provision like the ones in this case, with six and seven sub-headings, respectively, abundant use of legal terms, and numerous references to terms that are only defined elsewhere in the Agreement is almost inherently unclear.

### B. <u>Substantive Unconscionability</u>.

Substantive unconscionability exists when "the terms are oppressive to one party." *Machado v. System4 LLC*, 471 Mass. 204, 218 (2015). In § I(C) above, the Plaintiffs describe in detail all of the provisions in Uber's arbitration clause that make arbitration an illusory remedy in this case, namely, (1) the provisions imposing arbitration costs on the Plaintiffs, (2) the clauses that incorporate the limitation of liability provisions in the Agreements into the arbitration clauses and mandate that arbitral awards "must be consistent with" those limitations clauses, and (3) the unilateral modification clauses contained in both Agreements (which reference and incorporate the general modification provisions that appear at the beginning of the Agreements) and the lack of a limit on their retroactive application. Since the same provisions also make the arbitration provision substantially unconscionable, the Plaintiffs will not repeat the same arguments but instead incorporate them herein.

### C. <u>The Purported Delegation Language is Itself Unconscionable.</u>

Although the issue was apparently not raised in *Cullinane*, even in cases where courts have referred broader questions of contractual enforceability, including unconscionability defenses, to the arbitrator, they have reserved the question whether the delegation language is itself unconscionable. *See, e.g., Mohamed v. Uber Techs., Inc*., 2016 U.S. App. LEXIS 16413 (9th Cir. September 7, 2016). In *Cullinane*, the only delegation language that the Court considered relevant

was the reference to the Agreement being governed by AAA Rules, since AAA Rule 7(a) delegates certain issues, including "arbitrability" to the arbitrator. *Id*. at *26-*27. The Plaintiffs argue above (*see* § I(A)) that Uber modified Rule 7(a) to exclude issues of "arbitrability" from the arbitrator's jurisdiction, but even if that were not the case, the provision incorporating AAA Rules is unconscionable for largely the same reasons as the broader arbitration clause.

Procedurally, the lack of affirmative assent through a clickwrap agreement, the single clicking of "Done" instead of multiple affirmative acceptances, and the less prominent header all apply with equal force in this context. Moreover, the seven-paragraph length of the arbitration clause, as well as the attendant issues concerning the clarity of the language therein, is also relevant because the delegation language cannot be construed so narrowly as to only include the specific reference to the AAA rules. Since those rules apply only "except as modified by this 'Dispute Resolution' section," for a rider to comprehend his rights with respect to arbitration, he would have to read all of the AAA Rules and compare them to the entire seven-paragraph arbitration clause – surely an unduly complicated and confusing process. Similarly, since the "except as modified…" language effectively incorporates the broader arbitration clause as a whole, the clauses that make the arbitration clause substantively unconscionable (*see* §§ I(C) and II(B) above) also apply to the delegation language itself and have the same effect.

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion to Compel Arbitration and Dismiss the Complaint should be denied.

Dated: September 23, 2016

The Plaintiffs,
By their attorneys,

/s/W. Paul Needham
W. Paul Needham
BBO#368260
Mark A. Johnson
BBO#651271
NEEDHAM & JOHNSON
10 Liberty Square
Boston, MA 02109
Telephone: (617) 482-0500
Facsimile: (617) 482-0456
needhamandjohnson@nandjlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be mailed to those indicated as non-registered participants on September 23, 2016.

/s/W. Paul Needham
W. Paul Needham